MEMORANDUM DECISION AND ORDER
 

 KIMBALL, District Judge.
 

 This matter is before the court on Defendant Utah State Tax Commission’s (the
 
 *1273
 
 “Commission”) Motion for Summary Judgment. A hearing on that motion was held on April 11, 2000. At the hearing, Plaintiff Glenda A. Davis (“Davis”) was represented by Kathryn Collard, and The Commission was represented by Grant M. Sumsion. Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Memorandum Decision and Order.
 

 I. BACKGROUND
 

 This case involves two employment-related claims brought by Davis, a woman who allegedly suffers from multiple chemical sensitivity (“MCS”). One claim is brought under the Americans with Disabilities Act (the “ADA”), and the other claim is brought pursuant to 42 U.S.C. § 1983 (“Section 1983”), based on alleged violations of Davis’ Fourteenth Amendment rights to due process and equal protection.
 

 Davis worked for the Commission from 1986 through August of 1996. Sometime around June 1990, Davis became sensitive to strong fragrances worn by her coworkers.
 
 [1]
 
 When she smells strong fragrances (e.g., perfume, cologne, scented hand lotion), Davis experiences symptoms including headaches, nausea, mental confusion, numbness, a fast heart-rate, watery eyes, and she feels like her breath is “going away” or like her throat is closing. During the first few years, h.er sensitivity was not a significant problem at work because her supervisors accommodated her by asking her co-workers to not wear their perfumes or to reduce the amounts, and her co-workers cooperated. However, in 1994, her division was moved to a new building, and Davis was seated in a booth next to a woman named Lee Roberts (“Roberts”). Roberts wore very strong perfume, which bothered Davis. Davis spoke to her supervisor, Louise Hird (“Hird”), and Hird asked Roberts to stop wearing her perfume. The next day, Roberts stated in a note to Davis that she would not stop wearing her perfume. Davis gave the note to her supervisor and also spoke with Jan Herbert (“Herbert”), the Commission’s ADA coordinator. Davis requested to be moved away from Roberts. Herbert told Davis that she would not move her without a note from a doctor regarding her alleged problem with fragrances.
 

 On October 4, 1994, Davis saw Dr. Duane J. Harris, a board certified allergist. Dr. Harris subsequently provided Davis with a letter stating that Davis had complaints of chronic nasal symptoms after exposure to certain irritants at work. He stated in the letter that he had found that Davis had moderate to severe rhinitis and that “I have no doubt that she is, indeed, sensitive to a number of non-specific irritants including perfumes, hair spray, tobacco smoke, etc.” In the letter, he also stated that Davis had been started on medications and that he suspected that she would be much less symptomatic after several weeks of treatment. In addition, he stated in the letter that “in the interim, if it is at all possible to limit her exposure to these previously-mentioned irritants, I am certain that it would aid in the healing process.” Dr. Harris told Davis that he could not test her for specific allergies related to fragrances because the fragrances all had different chemicals in them, making it impossible to conduct allergy tests for perfumes, colognes, etc.
 

 After receipt of Dr. Harris’ letter, Hird moved Davis away from Roberts. For the next year or so, Davis did not have any significant problems. She admits that she was no longer “substantially impaired in her ability to breathe by Roberts’ strong perfume and could perform the duties' of her employment.” On a few occasions, the perfume of temporary employees bothered her, but she was able to tolerate it by
 
 *1274
 
 running a fan that she had brought from home.
 

 In April 1996, Davis’ unit moved to the other side of the building, and Irene Clark (“Clark”) became Hird’s supervisor. Hird sat Davis next to Bobbie Gavros (“Gav-ros”) because she was a co-worker whose use of fragrances had never before bothered Davis. Soon thereafter, however, Gavros began to use a strongly scented hand lotion for her dry skin. The scent irritated Davis, and she informed Hird that she could not breathe because of the strong scent. Davis claims that she had to leave work almost every day because of her reaction to the lotion. Hird spoke with Gavros and, explained that the scent of the lotion bothered Davis and asked her not to use it. However, Gavros refused to stop using the lotion. Davis claims that her fan was ineffective to prevent her from smelling the lotion. She claims that her ability to breathe was so impaired that her throat felt like it was closing, she had migraine headaches that lasted one to two days, and frequently had to leave work to go home. She claims that this constant exposure made her “sicker and sicker.”
 

 Davis spoke with Ms. Bird (“Bird”), a woman from the Commission’s Human Resources department, about wanting a place where she could do her job without being sick all of the time, and asked why she could not be moved to a different area. Bird allegedly responded, “Well, I suppose that we could put you in a room with glass all around, but then everyone would laugh at you.” Bird did not do anything to help. After being sick for a week or two and missing work, Davis again spoke with Hird about her headaches and difficulty breathing due to Gavros’ hand lotion, despite using her fan. Davis asked to be moved, but Hird stated that she would have to speak with Clark about it.
 

 Davis called Dr. Harris again to see if he could do anything to help her, but he stated that there was nothing more that he could do for her, and he recommended that she see Dr. Aldous, an ear, nose, and throat specialist. Davis saw Dr. Aldous, and he subsequently sent a letter to Clark stating that she “has a problem with chemical irritation from a number of sources. The one that is bothering her more in her current situation is a reaction to perfumes that causes her to have a feeling of numbness in her lips, her throat feels like she is choking, she gets hoarse, and her heart beats rapidly.” 'In the letter, Dr. Aldous recommended that Davis be moved away from the scent, stating that “the real treatment here is avoidance, and it would be my recommendation that she be placed in a position where she won’t be exposed to these particular irritants.” He also stated that it was his understanding that further allergy testing could not be done. Finally, he stated that “I expect Mrs. Davis is a good worker and deserves a transfer to a place where she won’t be irritated by the perfumes that are now making it difficult for her to work efficiently.”
 

 Davis spoke with Hird again, and stated that Clark should have received the letter from Dr. Aldous. Davis again requested that she be moved away from Gavros. Hird' — who Davis believes tried to help until she was “shut down” by dark — stated that she could not do anything until Clark returned from her vacation. Davis called the Commission’s Human Resources department again to explain that she was very ill from breathing the perfume and wanted to know if anyone could help her. She was referred to Dennis Payne (“Payne”), the Commission’s ADA coordinator. Payne explained that he would have to speak with Davis’ supervisor and manager. That afternoon, Clark then allegedly scolded Davis for going to the ADA coordinator and stated that she would handle the matter herself. Clark also allegedly responded that Davis was just “hyperventilating.” At that point or soon thereafter, Hird and Clark told Davis that they would not move her, and instead, they gave Davis a bigger fan to ventilate her work area. In her deposition, Davis testified that when she ran the fan on the high setting, she was able to keep the fragrances out of her work area. Howev
 
 *1275
 
 er, in a subsequent affidavit, she states that she could still smell the perfume. In any event, she claims that she could not continuously run the fan on high because her co-workers got mad at her because of the noise. Additionally, she claims that it was difficult to use the fan because it blew her papers around and made her very cold.
 

 At some point, Clark and/or Hird asked Davis how the fan was working, and Davis stated that it was working fine. Clark understood Davis’ response to mean that the fan was effective at keeping the fragrances away. Davis, however, claims that she meant that the
 
 fan
 
 was working fine. She claims that she started to explain that it was not effective at keeping strong fragrances away, but that Clark simply turned her back on her.
 
 [2]
 
 In any event, Clark did not move Davis away from Gavros.
 

 Davis finally quit in August 1996 because she allegedly could not tolerate Gav-ros’ lotion any longer. She claims that she was constructively discharged.
 

 II. STANDARD OF REVIEW
 

 A motion for summary judgment under Rule 56 of the Federal Rules, of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue .as to any material fact and that the moving party is entitled to judgment as a matter of law. The movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant’s case. If the movant carries this initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding .the existence of that element.
 
 See Celotex Corp. v. Catrett,
 
 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 The non-movant “must do more than simply show that there is some metaphysical doubt as to the material facts.”
 
 Matsushita Electric Industrial Co. v. Zenith Radio Corp.,
 
 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). While the non-movant is entitled' to the benefit of whatever reasonable inferences there are in its favor, the reasonableness of those inferences is scrutinized in light of the undisputed facts.
 
 Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute exists only if “the evidence is such that a reasonable jury could return a verdict for the nonmoving party.”
 
 Anderson,
 
 477 U.S. at 248, 106 S.Ct. 2505. “By its very terms, this standard provides that the mere existence of
 
 some
 
 alleged factual dispute between the parties will not defeat an otherwise properly supported' motion for summary judgment; the requirement is that there is no
 
 genuine
 
 issue of
 
 material
 
 fact.”
 
 Anderson,
 
 477 U.S. at 247-48, 106 S.Ct. 2505 (emphasis in original).
 

 III. DISCUSSION
 

 The Commission has moved for summary judgment on Davis’ claims under Section 1983, the ADA, the Utah Anti-Discrimination Act, and her state wrongful termination claim.
 
 [3]
 
 Davis clarified in her Opposition Memorandum and at the hearing on the motion that she had not alleged a claim under the Utah Anti-Discrimination Act or for wrongful termination under state law, and she agreed that the court need not rule on these portions of the Commission’s motion because they are moot. Thus, the court will address only
 
 *1276
 
 the Commission’s arguments pertaining to Davis’ claims under Section 1983 and the ADA.
 

 A. DAVIS’ CLAIMS UNDER SECTION 1983
 

 The Commission correctly argues that under
 
 Will v. Michigan Dep’t of State Police,
 
 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), “neither a State nor its officials acting in their official capacities are ‘persons’ under § 1983.” Because the Utah State Tax Commission is not a “person” under § 1983, Davis’ claims for deprivation of due process and equal protection fail because “a cause of action under § 1983 requires a deprivation of a civil right by a ‘person’ acting under color of state law.”
 
 Sutton v. Utah State School for the Deaf and Blind,
 
 173 F.3d 1226, 1237 (10th Cir.1999) (citing
 
 Will,
 
 491 U.S. at 64-65, 109 S.Ct. 2304);
 
 see also Arizonans for Official English v. Arizona,
 
 520 U.S. 43, 68-69, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997);
 
 Duncan v. Gunter,
 
 15 F.3d 989, 991 (10th Cir.1994). Because the Commission, an arm of the state, is not a “person,” for purposes of Section 1983, the claim cannot survive. Accordingly, The Commission’s motion for summary judgment is granted on this claim, and Davis’ claim under Section 1983 is dismissed with prejudice.
 

 B. DAVIS’ADA CLAIM
 

 The Commission has argued that the court must dismiss Davis’ ADA claim for numerous reasons. First, The Commission claims that in light of the United State’s Supreme Court’s recent decision in
 
 Kimel v. Florida Board of Regents,
 
 — U.S. -, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), The Commission is immune from suit under the ADA. Next, the Commission argues that, even if it is not immune from suit, it is entitled to summary judgment because Plaintiff is not disabled under the ADA, and even if she is disabled, she is not a qualified individual with a disability because no reasonable accommodation was possible. The court will address each of these arguments in turn.
 

 1. Is the State Immune from Suit Under the Eleventh Amendment?
 

 Because The Commission’s assertion of Eleventh Amendment immunity challenges the subject matter jurisdiction of this court, this issue must be resolved before addressing the merits of the underlying ADA claim.
 
 Martin v. Kansas,
 
 190 F.3d 1120, 1126 (10th Cir.1999) (citing
 
 Steel Co. v. Citizens for a Better Env’t,
 
 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Accordingly, this court must determine whether Subchapter 1 of the ADA, as applied to the states, exceeds Congress’ authority under the Fourteenth Amendment to the United States Constitution.
 
 [4]
 

 The Commission argues that the United States Supreme Court’s decision in
 
 Kimel
 
 compels the conclusion that the ADA is unconstitutional as applied to the states. In
 
 Kimel,
 
 the Court held that Congress did not validly abrogate states’ Eleventh Amendment immunity in the Age Discrimination in Employment Act (the “ADEA”).
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 650. The Commission contends that it is immune from suit because Congress’ statutory abrogation of Eleventh Amendment immunity in the ADA — just like in the ADEA — was not a valid exercise of its Section 5 power to enforce the Fourteenth Amendment. The Commission also argues that the Seventh Circuit, which addressed just weeks ago the very question at issue here in light of
 
 Kimel,
 
 was correct in determining that the ADA is unconstitutional as applied to the states.
 
 [5]
 
 For the
 
 *1277
 
 reasons set forth below, this court disagrees with the Commission and finds that it is not immune from suit under the ADA.
 

 (a)
 
 Tenth Circuit Precedent
 

 In
 
 Martin v. Kansas,
 
 190 F.3d 1120 (10th Cir.1999), the Tenth Circuit ruled on this very issue. The
 
 Martin
 
 court determined that Congress’ statutory abrogation of Eleventh Amendment immunity in the ADA was a valid exercise of its Section 5 power to enforce the Fourteenth Amendment. In
 
 Martin,
 
 the State moved to dismiss the suit because, it claimed, Congress did not enact the ADA’s accommodation provisions pursuant to'a valid.exercise of power. Specifically, the State contended that the ADA goes beyond other federal anti-discrimination statutes'in that it not only prohibits discrimination but also imposes affirmative duties on the State and its agencies to make reasonable accommodations to the known disabilities of employees. The State therefore argued that Congress exceeded its Section 5 enforcement power under the Fourteenth Amendment in enacting the ADA, and thus' improperly abrogated the State’s Eleventh Amendment immunity with respect to suits under the ADA.
 
 See id.
 
 at 1125-26.
 

 After an extensive analysis, however, the
 
 Martin
 
 court disagreed with the State. The court recognized that a state’s Eleventh Amendment
 
 [6]
 
 immunity from suit is not absolute; either a state may waive its sovereign immunity or Congress may abrogate the states’ sovereign immunity in the exercise of its Section 5 power to enforce the Fourteenth ‘ Amendment.
 
 Id.
 
 (citing
 
 College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 521
 
 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999)). Because the State had not waived its sovereign immunity by consenting to suit, its motion therefore depended on whether Congress properly abrogated the states’ immunity through the valid exercise of its Section 5 power. The Fourteenth Amendment provides in part that “‘[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States: nor shall any State deprive any person of life, liberty, or property, without due process of law: nor deny to any person within its jurisdiction the equal protection of the laws.’”
 
 Id.
 
 (quoting U.S. Const. amend. XIV, § 1). Section 5 of the Fourteenth Amendment empowers Congress to enact “appropriate legislation” to “enforce” the provisions of the Fourteenth Amendment.
 
 Id.
 
 (quoting U.S. Const. amend. XIV, § 5).
 

 The
 
 Martin
 
 court then analyzed whether Congress properly abrogated the states’ Eleventh Amendment immunity through the exercise' of its Section 5 enforcement power. The court employed the two-part test established by the United States Supreme Court in
 
 Seminole Tribe of Florida v. Florida,
 
 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). According to the
 
 Seminole Tribe
 
 test,' a court must first determine whether Congress “‘has unequivocally expressed' its intent to abrogate the immunity’; and second, a court must determine whether Congress acted ‘pursuant to a valid exercise of power.’ ”
 
 Martin,
 
 190 F.3d at 1126 (quoting
 
 Seminole,
 
 517 U.S. at 55, 116 S.Ct. 1114).
 

 In
 
 Martin,
 
 the parties agreed that Congress expressed its unequivocal intent to abrogate states’ immunity with respect to suits under the ADA.
 
 See
 
 42 U.S.C. § 12202 (“A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.”) Thus, the
 
 Martin
 
 court determined only whether Congress, in enacting the ADA, properly abrogated states’ immunity pur
 
 *1278
 
 suant to a valid exercise of its Section 5 enforcement power.
 
 Id.
 
 at 1126-27.
 

 In analyzing the issue, the
 
 Martin
 
 court explained that in
 
 City of Boerne v. Flores,
 
 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), “the Supreme Court discussed the limitation of congressional enforcement power under the Fourteenth Amendment, emphasizing that this power is ‘remedial’ in nature.”
 
 Id.
 
 at 1127 (citing
 
 City of Boerne,
 
 521 U.S. at 519, 117 S.Ct. 2157) (“Congress does not enforce a constitutional right by changing what the right is. It has been given the power ‘to enforce,’ not the power to determine what constitutes a constitutional violation.”). The
 
 Boerne
 
 Court held that there must be “ ‘a congruence and proportionality between the injury to be prevented or remedied and the means adapted to that end.’ ”
 
 Id.
 
 (quoting
 
 City of Boerne,
 
 521 U.S. at 520, 117 S.Ct. 2157). Accordingly, “ ‘for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment’s substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct.’ ”
 
 Id.
 
 (quoting
 
 Florida Prepaid Postsecondary Educ. Expense Bd. v. College Savings Bank,
 
 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999)).
 

 The Tenth Circuit further explained:
 

 [I]n
 
 City of Boeme,
 
 the Religious Freedom and [sic] Restoration Act (“RFRA”)-failed to meet this test because there was little record support that widespread religious bigotry was taking place and because RFRA’s provisions were “so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. Furthermore, RFRA attempted to expand the substantive meaning of the Fourteenth Amendment by imposing (in direct contravention of
 
 Employment Div., Dep’t of Human Resources of Oregon v. Smith,
 
 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)) a strict scrutiny standard of review for laws that burdened religious practices. The Court concluded that Congress acted in excess of its enforcement authority in enacting RFRA, and struck down the statute.”
 

 Id.
 
 (citations and quotations omitted).
 

 The
 
 Martin
 
 court also recognized that numerous circuit courts had addressed whether Congress’ enactment of the ADA was in excess of its enforcement authority and noted that the Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits had all concluded that the ADA does not run afoul of the “congruent and proportional” requirement. Only the Eighth Circuit had ruled otherwise.
 
 [7]
 

 Id.
 
 at 1127.
 

 The court in
 
 Martin
 
 agreed with the majority of circuits that the ADA does not run afoul of the “congruent and proportional” requirement. It reasoned that first, unlike the situation in
 
 City of Boerne,
 
 Congress, when it enacted the ADA, made numerous findings of fact regarding the pervasiveness of discrimination against disabled persons.
 
 Id.
 
 (citing numerous findings of Congress). The
 
 Martin
 
 court explained that “the Supreme Court has held that arbitrary discrimination by the state against disabled persons violates the Equal Protection Clause.”
 
 Id.
 
 at 1128 (citing
 
 City of Cleburne v. Cleburne Living Center,
 
 473 U.S. 432, 446, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Thus, the court concluded that under
 
 Cleburne,
 
 “the disabled are protected by the Fourteenth Amendment, and Congress is entitled to enforce this protection against the states.”
 
 Id.
 
 at 1128. The
 
 Martin
 
 court stated that “[g]iven that it is Congress’s prerogative to determine in the first instance what legislation may be needed to enforce the Fourteenth Amendment, its findings establishing the existence of widespread discrimination against the disabled are entitled to deference.”
 
 Id.
 
 (citing
 
 City of Boerne,
 
 117 S.Ct. at 2172).
 

 
 *1279
 
 Second, the
 
 Martin
 
 court reasoned' that “the remedial purposes of the ADA are tailored to remedying and preventing the discriminatory conduct, and are thus congruent and proportional to the injury to be prevented or remedied. The ADA prohibits only discrimination against ‘qualified individuals’ and it requires only ‘reasonable accommodations’ that do not impose an ‘undue burden’ on the employer.”
 
 Id.
 

 Accordingly, the
 
 Martin
 
 court concluded that
 

 “The ADA, unlike RFRA, is not attempting to impose a strict scrutiny standard on all state laws or actions in the absence of evidence of discrimination. ... Rather, the ADA seeks to impose a scheme that will adequately prevent or remedy a well-documented problem of discrimination without unduly burdening the [state]. It subjects some laws and official actions to a [reasonable accommodation’ requirement only to the point that the accommodation is not unduly, burdensome. Such a scheme, unlike RFRA, does not redefine or expand [disabled persons’] constitutional protections, but simply proportionally acts to remedy and prevent documented constitutional wrongs.”
 

 Id.
 
 (quoting
 
 Amos v. Maryland Dep’t of Pub. Safety & Correctional Servs.,
 
 178 F.3d 212, 219-220 (4th Cir.1999)). Thus, the Tenth Circuit held that the ADA was a permissible exercise of Congress’ Section 5 enforcement power.
 

 In this case, the Commission argues that
 
 Martin
 
 is no longer controlling law in light of
 
 Kimel.
 
 However, this court disagrees. Because the United States Supreme Court'has not spoken directly on the issue of whether the ADA is unconstitutional as1 applied to the states,
 
 [8]
 
 and the Tenth Circuit has spoken directly on that issue, this court is bound to follow the Tenth Circuit.' This is particularly true when the
 
 Kimel
 
 Court did not announce a new test to be applied by the courts in analyzing whether Congress' appropriately exercised its Section 5 enforcement power in abrogating states’ immunity. The
 
 Ki-mel
 
 Court merely applied the previous tests that it had announced in
 
 Seminole Tribe
 
 and refined in
 
 City of Boerne.
 
 Because the Tenth Circuit applied the very tests that
 
 Kimel
 
 requires,
 
 Martin
 
 is still good law that must be followed by this court. However, even if
 
 Martin
 
 were called into question by
 
 Kimel,
 
 this court believes that the ADA is still a permissible exercisé of Congress’ Section 5 enforcement power.
 

 (b)
 
 Kimel v. Florida Board of Regents
 

 On January 11, 2000, the United States Supreme Court, in
 
 Kimel v. Florida Bd. of Regents,
 
 — U.S. -, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), determined that the ADEA did
 
 not
 
 validly abrogate states’ Eleventh Amendment immunity from suit brought by private individuals.
 
 [9]
 

 Id.
 
 at 650. This was the first time in 50 years that the Supreme Court had declared a federal civil rights statute unconstitutional.
 
 See A Major Change in Civil Rights Litigation,
 
 36 TRIAL 94, March 2000.
 

 The
 
 Kimel
 
 court set forth two tests that a court must apply in analyzing this issue: First, “[t]o determine whether a 'federal
 
 *1280
 
 statute properly subjects States to suits by individuals we apply a simple but stringent test; Congress may abrogate the States’ constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute.”
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 640 (quotations omitted).
 
 [10]
 
 Second, Congress must effectuate that abrogation pursuant to a valid exercise of constitutional authority.
 
 Id.
 
 at 642, 120 S.Ct. 631. To answer the second question, courts must determine whether there is “a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.”
 
 Id.
 
 at 644 (quoting
 
 City of Boerne,
 
 521 U.S. at 520, 117 S.Ct. 2157.)
 

 The Court found that the substantive requirements the ADEA imposes on state and local governments are disproportionate to any unconstitutional age discrimination under the Equal Protection Clause.
 
 Id.
 
 at 645. It further noted that “[a]ge classifications, unlike governmental conduct based on race or gender, cannot be characterized as so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and apathy.”
 
 Id.
 
 (quotations and citations omitted). Moreover, “old age also does not define a discrete and insular minority because all persons, if they live out their normal life spans, will experience it.”
 
 Id.
 
 Thus, “[sjtates may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest.”
 
 Id.
 
 at 646. Accordingly, the Court determined that “the ADEA is ‘so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.’ ”
 
 Id.
 
 at 647 (quoting
 
 City of Boerne,
 
 521 U.S. at 532, 117 S.Ct. 2157).
 

 The Court then stated that “the ADEA prohibits very little conduct likely to be held unconstitutional, [but] while significant, does not alone provide the answer to our § 5 inquiry.”
 
 Id.
 
 at 648. Thus, it explained that its task was to determine whether the ADEA is an appropriate remedy or an attempt to substantively redefine the States’ legal obligations with respect to age discrimination.
 
 Id.
 
 “One means by which we have made such a determination in the past is by examining the legislative record containing the reasons for Congress’ action.”
 
 Id.
 
 The court emphasized that “[t]he appropriateness of remedial measures must be considered in light of the evil presented. Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one.”
 
 Id.
 
 (quotation omitted).
 

 The Court concluded that a “review of the ADEA’s legislative record as a whole revealed that Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age.”
 
 Id.
 
 at 649. The Court explained that the “lack of support is not determinative of the § 5 inquiry,” but that “Congress’ failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field.”
 
 Id.
 
 at 649-50. Therefore, “[i]n light of the indiscriminate scope of the Act’s substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States” the Court held that “the ADEA is not a valid exercise of Congress’ power under § 5 of the Fourteenth Amendment,” and the ADEA’s “purported abrogation of the States’ sovereign immunity is accordingly invalid.”
 
 Id.
 
 at 650.
 

 (c)
 
 Post-Kimel Case: Erickson v. Board of Governors of State Colleges and Universities for Northeastern Illinois University
 

 In
 
 Erickson v. Board of Governors of State Colleges and Universities for North
 
 
 *1281
 

 eastern Illinois University,
 
 207 F.3d 945 (7th Cir.2000), a divided panel of the Seventh Circuit determined, in light of
 
 Kimel,
 
 that Title I of- the ADA is
 
 not
 
 a valid exercise of power under § 5 of the Fourteenth Amendment.
 
 [11]
 
 The court noted that, of the three .times that the Supreme Court has addressed the extent of legislative power under § 5, “thrice it has stressed that the language of § 5 must be taken seriously. Statutes that create new rights, or expand old rights beyond the Fourteenth Amendment’s bounds, do not ‘enforce’ that amendment.”
 
 Id.
 
 at 946
 

 The
 
 Erickson
 
 court found that
 

 [T]he two propositions announced in
 
 Ki-mel
 
 regarding the ADEA are true for the ADA as well — indeed, the ADA is harder to conceive as ‘enforcement’ of the Fourteenth Amendment than is the ADEA. Under the ADEA employers must ignore age but are free to act on the basis of attributes such as strength, mental acuity and salary that are. related to age. In other words, the ADEA forbids disparate treatment but not disparate impact. Title I of the ADA, by contrast, requires employers to consider and to accommodate disabilities, and in the process extends beyond the anti-discrimination principle.
 

 Id.
 
 at 948. The court explained that a rational basis test applies to distinctions on the ground of disability, just as to distinctions on the ground of age. Like the ADEA, the ADA “prohibits very little conduct likely to be held unconstitutional.”
 
 Id.
 
 at 948 (quotation omitted). “By requiring that employers accommodate rather than disregard disabilities, the ADA is a cousin to the RFRA.”
 
 Id.
 
 at 950. In fact, “[rjational discrimination against persons with disabilities is constitutionally, permissible in a way that rational discrimination against religious practices is not. This makes the ADA harder than the RFRA to justify under § 5.”
 
 Id.
 
 The court found that if the RFRA and the ADEA exceed the § 5 power,- then so does the ADA — at least to the extent it extends beyond reme-diés for irrational discrimination.”
 
 Id.
 
 at 950.
 

 The court then analyzed whether the ADA could be sustained as reasonable prophylactic legislation! It stated that “[b]e-cause the ADA requires accommodation, forbids practices with disparate impact, and disregards the employer’s intent, it is harder than the ADEA to characterize as a remedial measure.”
 
 Id.
 
 at 951. The legislative history about discrimination fails to distinguish between rational and irrational distinctions. The court determined that the background of the ADA does not meet the standards that
 
 Boeme
 
 and
 
 Kimel
 
 set for using § 5 to enact prophylactic legislation. Thus, the ADA does not “enforce” the Fourteenth Amendment, and the Eleventh Amendment blocks private litigation against states in federal court.
 
 Id.
 
 at 952.
 

 (d)
 
 Discussion
 

 Even if this court were not bound by the Tenth Circuit’s decision in
 
 Martin,
 
 and notwithstanding
 
 Kimel, Erickson,
 
 and
 
 Stevens,
 
 this court finds that the ADA is a permissible exercise of Congress’ Section 5 enforcement power.
 

 The first question to be answered is whether Congress made its intention to abrogate the states’ immunity unmistakably clear in the ADA.
 
 See Kimel
 
 — U.S. at -, 120 S.Ct. at 640;
 
 Seminole Tribe,
 
 517 U.S. at 55, 116 S.Ct. 1114;
 
 Martin,
 
 190 F.3d at 1126. The parties do not dispute this point.
 
 See also
 
 42 U.S.C. § 12202 (“A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.”);
 
 Erickson,
 
 207 F.3d 945, 947.
 

 
 *1282
 
 Thus, the issue for the court to determine is whether Congress acted “pursuant to a valid exercise of power.”
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 642;
 
 Martin,
 
 190 F.3d at 1126 (quoting
 
 Seminole,
 
 517 U.S. at 55, 116 S.Ct. 1114). To answer that question, the court must ascertain whether there is “a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.”
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 642, and “whether the ADA is an appropriate remedy or an attempt to substantively redefine the States’ legal obligations with respect to age discrimination.”
 
 Id.
 
 at 648. As the
 
 Kimel
 
 Court stated, this latter determination can be made by examining the legislative record containing the reasons for Congress’ action.
 
 See id.
 

 The Tenth Circuit already applied these tests in
 
 Martin,
 
 and the court’s reasoning is as persuasive post
 
 -Kimel
 
 as it was pre-
 
 Kimel.
 
 In
 
 Martin,
 
 the court reasoned that (1) unlike the situation in
 
 Boerne,
 
 (and now in
 
 Kimel)
 
 Congress, when it enacted the ADA, made numerous findings of fact regarding the pervasiveness of discrimination against disabled persons, and (2) “the remedial purposes of the ADA are tailored to remedying and preventing the discriminatory conduct, and are thus congruent and proportional to the injury to be prevented or remedied. The ADA only prohibits discrimination against ‘qualified individuals, and it requires only ‘reasonable accommodations’ that do not impose an ‘undue burden’ on the employer.”
 
 Martin,
 
 190 F.3d at 1128.
 

 Furthermore, applying the above-mentioned tests, Judge Diane P. Wood, in her dissent in
 
 Erickson,
 
 skillfully and. thoroughly fleshed out why Congress legitimately used its power under § 5 of the Fourteenth Amendment when it made the ADA applicable to the states, and this court adopts her reasoning.
 

 Judge Wood concluded that the ADA differs critically from the ADEA in the areas the Supreme Court deemed significant. First, in determining that there is a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end, Judge Wood explained that the ADA represents a proportionate response to the likelihood of constitutional violations. Specifically, she highlighted that, in
 
 City of Cleburne,
 
 the Court raised the level of review above that of a rational basis test for disabilities, even though the Court was careful not to use terms like “suspect” or “quasi-suspect.” 207 F.3d 945, 955 (Wood, J., dissenting). Moreover, she explained that the ADA is indeed a statute designed to prohibit irrational discrimination. For example, in
 
 Ki-mel,
 
 the Court observed that older persons “have not been subjected to a history of purposeful unequal treatment.”
 
 Id.
 
 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 645). In contrast, Congress found in the ADA that disabled persons have been “ ‘subjected to a history of purposeful unequal treatment,’ ” “ ‘in such critical areas as employment, housing, public accommodation, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services.’ ”
 
 Id.
 
 at 956 (quoting 42 U.S.C. § 12101). In addition, the
 
 Kimel
 
 Court recognized that “in no meaningful sense of the term can the elderly be regarded as a ‘discrete and insular minor-it[y].”
 
 Id.
 
 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 645). To the contrary, “all persons, if they live out their normal life spans, will experience [old age].’ ”
 
 Id.
 
 at 956 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 645). Thus, Judge Wood noted that “this is a strong reason to believe that the normal political processes are adequate to protect the interests of the elderly and that they will not be singled out for unconstitutionally discriminatory treatment.”
 
 Id.
 

 Judge Wood pointed out that, to the contrary, not everyone will become disabled.
 
 Id.
 
 The ADA, unlike the ADEA, reflects Congress’ finding that society has the ability to, and has historically, “tended to isolate and segregate individuals with disabilities.”
 
 Id.
 
 at 956 (quoting 42 U.S.C.
 
 *1283
 
 § 12101). Judge Wood also explained that there are other reasons to conclude that the ADA is a permissible exercise of Congress’ Section 5 power:
 

 Apart from the salient differences between age and disability as bases for categorization, the two statutes fare quite differently under the proportionality analysis required by
 
 Boerne
 
 and
 
 Ki-mel.
 
 The broad sweep of the ADEA caused the Supreme Court to find that it was not a proportional response to the problem of age discrimination. ' The ADEA prohibits all employment discrimination on the basis of age against persons in the protected class (those above the age of 40). 29 U.S.C. § 623(a)(1). The only tempering of this rule appears in the statutory rules allowing an employer to justify age-based distinctions if it shows either a substantial basis for believing,that all or nearly all employees above a given age lack the qualifications required for the position or that reliance on the age classification is necessary because individual testing for qualifications is highly impractical. The EEOC’s implementing regulations, as well as cases decided under the ADEA, make it clear that these exceptions were intended to be narrow ones.
 

 The ADA adopts a more nuanced approach to the problem of disability discrimination. An employer is entitled to treat a disabled person differently — indeed, even to deny employment to the person on that basis — if there are no reasonable accommodations that will permit the individual to do the job and she cannot handle the job without accommodations. Thus, while an employer discriminating on the basis of age must demonstrate that it would be “highly impractical” not to do so, an employer making distinctions on the basis of disability need only show that “reasonable steps” of accommodation, such as modifying work schedules, training materials, facilities, or policies will not work. The incorporation of a reasonableness standard in the duty to accommodate, which itself modifies the duty not to discriminate on the basis of disability, is essentially a legislative incorporation of the proportionality test required under the Constitution. It also illustrates, contrary to the majority’s suggestion, that the duty to accommodate is not a command to give “special” treatment; instead, it spells out the way that discrimination is to be avoided. '
 

 Id.
 
 at 956 (citations omitted). Accordingly, she determined that the ADA meets the first part of the
 
 Kimel
 
 analysis.
 

 Judge Wood further explained that the second question under Kimel requires consideration of whether the legislative record reveals either a pattern of age discrimination committed by the states or “any discrimination whatsoever that [rises] to the level of a constitutional violation.”
 
 Id.
 
 at 957 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 649). She highlighted that while the evidence is stronger on the second point than the first, the record shows both kinds of disability discrimination. First, the House Report notes that “ ‘inconsistent treatment of people with disabilities by different state or local government agencies is both inequitable and illogical.’ ”
 
 Id.
 
 (quoting H.R.Rep. No. 101-485(II)). In addition, the express congressional findings address many areas that are controlled to a significant degree by state and local ‘ governments. For example, Congress identified discrimination in education as a particular problem. Other sectors singled out include health services and transportation. These sectors have a substantial state and local government presence, indicating that Congress knew that government action at the state level was an important part of the problem that it was addressing.
 

 Moreover, the ADA’s legislative findings distinguish the ADA from both the ADEA and RFRA. Congress did not make findings in the RFRA about the seriousness or scope of discrimination against religious persons. In the ADEA, Congress never identified “ ‘any discrimination whatsoever that arose to the level of constitutional
 
 *1284
 
 violation.’ ”
 
 Id.
 
 at 958 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 649). “The only evidence the
 
 Kimel
 
 Court found showing the harm at which the ADEA was aimed was a few ‘isolated sentences clipped from floor debates and legislative reports.’ ”
 
 Id.
 
 (quoting
 
 Kimel,
 
 — U.S. at -, 120 S.Ct. at 649). In contrast, when formulating the ADA, Congress compiled “an immense legislative record. It examined all of the evidence and found that ‘[t]he severity and pervasiveness of discrimination against people with disabilities [was] well documented.’ ”
 
 Id.
 
 (quoting H.R. 101-485(11)).
 

 Judge Wood noted that the majority in
 
 Erickson
 
 had attached too much significance to the fact that there is no explicit statement in the ADA stating “ ‘we are passing this law because we need to correct discrimination on the basis of disability committed by the states.’ ”
 
 Id.
 
 Judge Wood reasoned and this court agrees— that
 

 “[N]othing in
 
 Kimel
 
 ... gives such primacy to this single point. Combining the explicit coverage of sectors in which the states are the principal actors, with the deliberate decision of Congress to make the states subject to the statute, and finally with the enormous legislative record documenting the depth of the problem of disability discrimination, I find the second part of the
 
 Kimel
 
 approach to be satisfied for the ADA.”
 

 Id.
 
 Thus, Judge Wood concluded that the legislative basis for a valid exercise of Congress’ Section 5 power is present for the ADA. Numerous other courts have also so concluded.
 
 See Muller v. Costello,
 
 187 F.3d 298 (2d Cir.1999);
 
 Coolbaugh v. Louisiana,
 
 136 F.3d 430 (5th Cir.1998),
 
 cert. denied,
 
 525 U.S. 819, 119 S.Ct. 58, 142 L.Ed.2d 45 (1998);
 
 Clark v. California,
 
 123 F.3d 1267 (9th Cir.1997),
 
 cert. denied,
 
 524 U.S. 937, 118 S.Ct. 2340, 141 L.Ed.2d 711 (1998);
 
 Martin v. Kansas,
 
 190 F.3d 1120 (10th Cir.1999);
 
 Kimel v. Florida Bd. of Regents,
 
 139 F.3d 1426 (11th Cir.1998),
 
 cert. granted,
 
 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999),
 
 cert. dismissed,
 
 — U.S. m-, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000);
 
 Garrett v. University of Ala. at Birmingham Bd. of Trustees,
 
 193 F.3d 1214, 1218 (11th Cir.1999),
 
 cert. granted in part,
 
 — U.S. -, 120 S.Ct. 1669, — L.Ed.2d - (2000);
 
 Lamb v. John Umstead Hosp.,
 
 19 F.Supp.2d 498 (E.D.N.C.1998).
 

 Accordingly, for the reasons set forth in
 
 Martin
 
 and Judge Wood’s dissent in
 
 Erickson,
 
 this court finds that Congress’ abrogation of the states’ sovereign immunity from suit under the ADA was a valid exercise of its Fourteenth Amendment enforcement power. Therefore, the Commission is not immune from suit under the ADA, and the court must now determine whether Davis has created a triable issue of fact regarding her claim under the ADA.
 

 2. Is Davis a Qualified Individual with a Disability?
 

 Under the ADA, Davis, must first establish that she is a qualified person with a disability, which means that she is “an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.” 42 U.S.C. § 12111(8);
 
 Sutton v. United Air Lines, Inc.,
 
 130 F.3d 893, 897 (10th Cir.1997),
 
 aff'd,
 
 525 U.S. 471, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999). The Commission argues that Davis is not disabled and that she was not a qualified individual.
 

 a. Was Davis “Disabled” As Defined by the ADA?
 

 The ADA defines disability, in pertinent part, as “a physical or mental impairment that substantially limits one or more of the major life activities of such individual.” 42 U.S.C. § 12102(2). Davis argues that her alleged MCS is a physical impairment that substantially limits the major life activity of breathing, which is expressly included in the EEOC’s definition of major life activities, 29 C.F.R. § 1630.2(f). Pursuant to the ADA regulations, in order for an im-
 
 *1285
 
 pairraent to be “substantially limiting,” the individual must be:
 

 (i) Unable to perform a major life activity that the average person in the general population can perform; or
 

 (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
 

 29 C.F.R. § 1630.2(j)(1). In determining whether an individual is substantially limited in a major life activity, the following three factors should be considered: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2);
 
 Sutton,
 
 130 F.3d at 900.
 

 The Commission argues that Davis does not have a disability. First, the Commission claims that the medical evidence demonstrates that ’her ability to breathe was not substantially impaired during her employment. Specifically, the Commission argues that both physicians testified that Davis was not disabled and that she had no medical condition that would substantially limit her ability to breathe. The Commission also points out that Davis has provided no expert who will so testify and that neither an employer nor a court can be expected to make a finding of disability based on the subjective testimony of the claimant. ■ The Commission claims that Davis “insists” that her breathing was not generally impaired. Consequently, the Commission claims that having an impairment around only Bobbie Gavros is not a substantial limitation. It also claims that Davis has the burden “to demonstrate that [s]he is disabled in some more general Sense transcending h[er] specific job,” citing
 
 Bolton v. Scrivner, Inc.,
 
 836 F.Supp. 783, 788 (W.D.Okla.),
 
 aff'd,
 
 36 F.3d 939 (10th Cir.1994),
 
 cert. denied,
 
 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995). Thus, the Commission claims that, because Davis “fiercely denies that her breathing was generally impaired in any way that transcended her job,” she is not disabled.
 

 To the contrary, Davis claims that a reasonable jury could find that she had a sensitivity-to the highly fragrant perfumes and lotions that substantially impaired her breathing during the last three months of her employment with the Commission.
 
 [12]
 
 She claims that the affidavits that her two physicians submitted in support of the Commission’s motion are misleading because, she claims, the Commission misrepresented Davis’ claim to the physicians by advising them that Davis claimed that her ability to breathe was substantially impaired at' all times during her employment. Davis explains that she was never exposed to these irritants while in the doctors’ offices, so her breathing was not impaired
 
 *1286
 
 when they examined her. Davis argues that after the Commission obtained an affidavit from Dr. Harris, she obtained another affidavit (the “Second Affidavit”) from Dr. Harris to clarify several points.
 

 In the Second Affidavit, Dr. Harris states that he never saw or examined Davis at a time when she was actually exposed -to such irritants and that he could not test her impairment. Thus, he admits that he has no personal knowledge of the symptoms she experienced when confronted with strong fragrances. He also explains that in his first affidavit, submitted in conjunction with the Commission’s motion, he stated that Davis was not substantially impaired in her breathing, but in his Second Affidavit, he clarifies that Davis never claimed that her breathing was generally impaired. Specifically, Dr. Harris explains that he has a note that he wrote upon examining her that her symptoms were “related temporally” to irritant exposure. He also admits in his Second Affidavit that he concluded that she had no symptoms of multiple chemical sensitivity because “I do not believe Multiple Chemical Sensitivity exists, and therefore I do not believe that Ms. Davis has any symptoms of this non-existent condition.” He also states in the Second Affidavit that “it is my opinion that the objective symptoms of rhinitis disclosed during that examination are consistent with a sensitivity to perfume or other irritants in the workplace reported by Ms. Davis on that occasion, and that limiting her exposure to such irritants was a reasonable way of alleviating her discomfort from being exposed to such irritants, as indicated in my letter of October 4, 1994.” Davis also highlights that both physicians indicated in their letters that Davis had consulted them regarding her problems related to exposure to strongly scented perfumes and that they both suggested that Davis be placed in a position where she would not be exposed to the fragrances. Both doctors also stated that no testing is available.
 

 Further, Plaintiff argues that she does not need medical testimony to establish her impairment, pointing to the EEOC Compliance Manual, which states that “other information, such as the charging party’s description of his/her condition or statements from the charging party’s friends, family, or co-workers, may also be relevant to determining whether the charging party has an impairment.” EEOC Compliance Manual, § 902.6.
 

 This court cannot determine as a matter of law that Davis was not disabled. The statutory requirement that disability determinations be made “with respect to the individual,” contemplates an individualized, and case-by-case determination of whether a given impairment substantially limits a major life activity of the individual.
 
 Sutton,
 
 130 F.3d at 897. Further, “[t]he determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. Some impairments may be disabling for particular individuals but not for others, depending on the state of the disease or disorder, the presence of other impairments that combine to make the impairment disabling or any number of other factors.” 29 C.F.R. § 1630, App. § 1630.20) para. 1-2. The impairment “must be significant, and not merely trivial.”
 
 Id.
 
 at 898.
 

 In this case, Davis has provided significant evidence about the effect on her of strong fragrances and the length to which she goes to avoid being exposed for prolonged periods to such fragrances in her daily life. In addition, she consulted two physicians regarding her chemical sensitivity problems. However, she was not symptomatic during either of her appointments because she was not exposed to fragrances in the doctors’ offices. She was told that there was no test that could be performed to determine which fragrances caused a reaction. Dr. Harris, in his Second Affidavit, states that “it is my opinion that the objective symptoms of rhinitis disclosed during that examination are consistent with a sensitivity to perfume or other
 
 *1287
 
 irritants in the workplace reported by Ms. Davis on that occasion, and that limiting her exposure to such irritants was a reasonable way of alleviating her discomfort from being exposed to such irritants, as indicated in my letter of October 4, 1994.” Dr. Aldous also suggested that Davis be placed in a position where she would not be exposed to the fragrances because avoidance was the best treatment. Moreover, Davis’ sister and mother have testified at length about Davis’ sensitivity to fragrances and the effect they have on Davis.
 

 The Commission’s reliance on
 
 Bolton
 
 for the proposition that her impairment must transcend her specific job is misplaced because
 
 Bolton
 
 dealt with an individual who claimed a substantial limitation in the major life activity of working, and the Com- • mission’s quote pertains to an analysis of whether someone is limited in their ability to work. The Commission has confused the required analysis pertaining to being substantially limited in the-major life activity of working with the fact that Davis’ symptoms occur primarily at work because that is the only place where she cannot control her environment and she has apparently been required to work in close proximity to an individual who surprisingly refuses to refrain from using highly scented hand lotion. The fact that she usually only suffers her breathing difficulties at work does not mean, as a matter of law, that she is not significantly limited in the major life activity of breathing.
 

 This court finds that Plaintiff has presented sufficient.evidence to.create a jury issue on whether she has a disability because a reasonable jury could conclude, based on this evidence, that Davis has an impairment that substantially limits the major life activity of breathing. Specifically, a jury could reasonably determine that Davis is “significantly restricted as to the condition, manner or duration under which she can [... breathe] as compared to the condition, manner, or duration under which the average person in the general population can [... breathe].”
 
 See
 
 29 C.F.R. § 1630.2(j)(1);
 
 see also Whillock v. Delta Air Lines, Inc.,
 
 926 F.Supp. 1555, 1562-63 (N.D.Ga.1995) (finding that plaintiff had presented suffícieñt evidence to create a triable issue regarding whether she has a disability due to MCS under the ADA),
 
 aff'd,
 
 86 F.3d 1171 (11th Cir.1996);
 
 Treadwell v. Dow-United Technologies,
 
 970 F.Supp. 974, 977-79 (M.D.Ala.1997) (stating that court had previously denied defendant’s motion for summary judgment on plaintiffs ADA claim regarding MCS).
 

 'The court is aware of the many cases that hold that an individual is not “disabled” if she has an impairment that is under control, such as diabetes. However, the court is unaware of any authority analyzing a situation like the one here in which Davis has what is arguably a controllable condition, but her employer allegedly refused to make the reasonable ac: commodations necessary to permit Davis to control it. Thus, the court denies the Commission’s motion for summary judgment on this issue.
 

 b.
 
 Was
 
 Davis a Qualified Individual?
 

 The Commission argues that Davis is covered by the ADA only if she is capable of performing the essential functions of the job “with or without reasonable accommodation.”
 
 See, e.g., Anderson v. Coors Brewing Co.,
 
 181 F.3d 1171, 1175 (10th Cir.1999). It claims that because Davis admitted that her supervisor did everything possible to accommodate her, and because Davis was unable to come forward with, a reasonable accommodation that would, be effective, she was not a qualified individual with a disability. Specifically, the.. Commission that Davis admitted that there was no place within her unit to,which she could have been moved that would have been better for her.. The Commission relies on the fact that Davis was not
 
 certain
 
 that she would be better off if she sat elsewhere because she did not know if anyone else’s perfume would bother her, and she admitted that she did smell, other perfume in her unit at times.
 

 
 *1288
 
 Davis disputes the Commission’s conclusions, stating that she did not agree that her supervisors did everything possible to accommodate her. She explains that she believed that Hird did everything she could to help until Irene Clark “shut her down.” In addition, Davis testified in her deposition that she suggested that Gavros be moved away from Davis or that the people who wore perfume could be grouped together and those who did not could be grouped together. Davis explained in her deposition that, while she occasionally smelled perfume other than Gavros’ lotion, it was fairly weak, and it did not bother her. She claims that proximity and concentration are the factors that determine whether a fragrance causes her to have a reaction.
 

 Davis does not dispute that she could not have worked outside of the tax processing center because of the confidential nature of the tax returns to which she needed access as an essential function of her job, so she does not dispute that she never asked to work at home. She claims that there is no evidence to support the Commission’s contention that “there was no place else to move plaintiff.”
 

 Davis claims — and this court agrees— that she has clearly presented material factual disputes on this issue to preclude summary judgment. This court has not seen any evidence that Davis admitted that the Commission could do nothing to assist her. To the contrary, Davis suggested moving her or grouping together people who wear fragrances and those who do not. These are both reasonable accommodations that a reasonable jury could determine to have been effective. Similarly, a jury could determine that Davis’ request that Gavros be instructed not to wear such a strongly scented lotion would have been a reasonable accommodation. Although Davis was not one-hundred percent certain that moving her would remedy the situation because she could not be assured where she would be seated, the law does not impose upon her that burden. Although it is Davis’ burden to begin the interactive process regarding reasonable accommodations, Davis certainly satisfied that requirement. Accordingly, the Commission’s motion for summary judgment on Davis’ ADA claim is denied.
 

 IY. CONCLUSION
 

 For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED that the Commission’s Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, Davis’ claim under 42 U.S.C. § 1983 is dismissed with prejudice, but factual issues preclude entry of summary judgment on Davis’ claim under the Americans -with Disabilities Act.
 

 [1]
 

 . Davis alleges that her symptoms started very soon after she was exposed to "toxic fumes” in her office building in June 1990. At that time, Davis and several other employees were evacuated and taken to the hospital.
 

 [2]
 

 . The Commission claims that'Davis has created this "sham” issue of fact by submitting an affidavit that contradicts her previous deposition testimony. While it is true that Davis did not explain this situation in her deposition — she merely stated that the fan worked fine, her subsequent affidavit does not necessarily contradict her deposition testimony, and it appears to comport with the substance of her deposition testimony in general on this issue.
 

 [3]
 

 . The Commission explained that it was not clear from Davis' Complaint whether she was alleging claims under the Utah Anti-Discrimination Act and for constructive discharge without “good cause,” but that to the extent those claims were alleged, they should be dismissed.
 

 [4]
 

 . In her opposition memorandum, Davis conceded that the Commission was immune from suit for monetary damages under
 
 Kunel.
 
 At the hearing on the motion, however, Davis retracted her concession and argued that the Commission was not immune.
 

 [5]
 

 . After the April 11, 2800 hearing, the Commission provided the court with a second decision by the Seventh Circuit, which expands on that court's prior decision in
 
 Erickson v. Board of Governors,
 
 207 F.3d 945 (7th Cir.2000).
 
 See Stevens v. Illinois Dep’t of Transp.,
 
 210 F.3d 732 (7th Cir.2000).
 

 [6]
 

 . The Eleventh Amendment provides:
 

 The Judicial power of the United States shall not be construed to. extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 

 Id.
 
 at 1126 (quoting U.S. Const. amend. XI).
 

 [7]
 

 . However, since that time, the Seventh Circuit has ruled to the contrary.
 
 See Erickson v. Bd. of Govs.,
 
 207 F.3d 945 (7th Cir.2000);
 
 Stevens v. Illinois Dep't of Transp.,
 
 210 F.3d 732 (7th Cir.2000).
 

 [8]
 

 . Two weeks after
 
 Kimel
 
 was decided, the United States Supreme Court had granted certiorari in two cases that challenged the immunity of states sued under the ADA. However, because the parties settled after certiora-ri had been granted, the Supreme Court will not review the cases after all.
 
 See Dickson v. Florida Dep’t of Corrections,
 
 139 F.3d 1426 (11th Cir.1998),
 
 cert. granted sub nom. Kimel v. Florida Bd. of Regents,
 
 - U.S. -, 120 S.Ct. 631, 145 L.Ed.2d 522 (1999),
 
 and cert. dismissed,
 
 - U.S. -, 120 S.Ct. 1236, 145 L.Ed.2d 1131 (2000); and
 
 Alsbrook v. City of Maumelle,
 
 184 F.3d 999 (8th Cir.1999) (en banc),
 
 cert. granted in part sub nom. Alsbrook v. Arkansas,
 
 — U.S. -, 120 S.Ct. 1003, 145 L.Ed.2d 947 (2000),
 
 and cert. dismissed,
 
 — U.S. -, 120 S.Ct. 1265, - L.Ed.2d -(Mar. 1, 2000).
 

 [9]
 

 .
 
 Kimel,
 
 like the other recent Eleventh Amendment/states rights cases, was a 5-4 decision with the Court splitting between Justices Rehnquist, Scalia, Thomas, O’Connor, and Kennedy versus Justices Souter, Breyer, Ginsburg, and Stevens.
 

 [10]
 

 . The Court agreed that the ADEA satisfies
 
 east
 
 test.
 
 Id.
 
 at 640.
 

 [11]
 

 . Judges Eschbach, Easterbrook, and Wood were on the panel. As discussed below, Judge Wood dissented. As noted above at note 5, another panel of the Seventh Circuit subsequently ruled again on this issue in
 
 Stevens
 
 and elaborated in that case on the reasons for determining that the ADA is unconstitutional as applied to the states.
 
 See Stevens v. Illinois Dep’t of Transp.,
 
 210 F.3d 732 (7th Cir.2000).
 

 [12]
 

 . In her opposing memorandum, Davis is not always consistent regarding her arguments about her breathing being substantially impaired. At times she argues that her breathing is substantially impaired, at other times she argues that it is only impaired at work or only impaired at work for her last three months, and at other times only around Ms. Gavros. If she were only impaired around one individual, she would not be “disabled” as defined by the ADA. However, her deposition testimony makes clear that such is not the case. Because of the nature of her alleged MCS, Davis is not always symptomatic. The evidence demonstrates that Davis
 
 always
 
 faces the possibility of having her breathing impaired, but that she can usually avoid prolonged exposure to irritants outside of work. For example, she testified in her deposition that she avoids certain stores entirely and she avoids certain aisles (candles, soaps, etc.) at the grocery store, wears a mask when she cannot avoid going through the perfume area at a department store, asks to be moved when she is seated next to someone with strong perfume at restaurants, on airplanes, or at performances, etc. At times, she has had to leave certain events to ¿void prolonged exposure. Thus, her alleged MCS affects her daily life, but she becomes sympto.matic usually only at work because she cannot avoid, escape, or control her surroundings.