**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 11 2000**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

REBECCA CISNEROS,

    Plaintiff-Appellant,

v.

HEATHER WILSON, Cabinet Secretary;
CHRISTINE ROMERO, in her individual
capacity,

    Defendants,

and

    No. 98-2215

CHILDREN, YOUTH AND FAMILIES
DEPARTMENT, as a branch of the State
of New Mexico,

    Defendant-Appellee.

---

UNITED STATES OF AMERICA,

    Intervenor.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-96-1493 LH/DJS)**

---

Donna L. Dagnall, Dagnall, Rames & Thomas, Albuquerque, New Mexico, for Plaintiff-
Appellant.

Paula I. Forney, State of New Mexico, Legal Bureau/RMD, Santa Fe, New Mexico, for

Defendant-Appellee.

Jessica Dunsay Silver, Seth M. Galanter, Attorneys, Department of Justice, Washington, D.C., filed a brief for the Intervenor.

---

Before **EBEL**, **HOLLOWAY**, and **KELLY**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

Plaintiff Rebecca Cisneros (Plaintiff) brought this action against the New Mexico Department of Children, Youth, and Families (Defendant Department).[1] Plaintiff alleged that Defendant Department (1) terminated her because of her disability (severe depression and acute anxiety) in violation of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and (2) retaliated against her in violation of Title VII of the 1964 Civil Rights Act (Title VII), as amended, 42 U.S.C. §§ 2000e to 2000e-15, because she had filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC). The district court granted Defendants' motion for summary judgment on both claims, holding that Plaintiff could not prove: (1) that she was a "qualified individual with a disability" as required by the ADA, or (2) that she was retaliated against because she had filed charges with the EEOC as required by Title VII.

The Plaintiff appealed. Following argument there was an intervening Supreme

---

[1] Plaintiff also brought claims against various employees of Defendant Department. The district court dismissed those claims. See I App. at 31. Plaintiff has not appealed that ruling.

Court opinion that was handed down in January 2000, <u>Kimel v. Florida Bd of Regents</u>, 120 S. Ct. 631 (2000). We requested supplemental memoranda from the parties and from the Government as an intervenor. These have been considered and we have determined that the Eleventh Amendment, which was raised at oral argument, does not bar this suit and that we have jurisdiction pursuant to 28 U.S.C. § 1291. For reasons that follow, we affirm in part, reverse in part, and remand for further proceedings.

**I**

**A**

Because the district court granted Defendants' motion for summary judgment, we view the evidence in the light most favorable to Plaintiff. <u>See</u> <u>McGarry v. Bd of County Comm'rs</u>, 175 F.3d 1193, 1198 (10th Cir. 1999) ("We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.").

From 1984 until 1995, Plaintiff worked for the Defendant Department (and various other state agencies). In May 1995, Plaintiff was ordered to investigate another employee for possible wrongdoing. During the four days of the investigation, Plaintiff was placed under "extraordinary" emotional strain which caused Plaintiff to suffer a mental breakdown on May 19, 1995. Before her breakdown, Plaintiff had no mental disability. Instead, she was a "fully competent" employee who was "performing the duties of her position." After her breakdown, Plaintiff was unable to work. She sought treatment from

a psychiatrist, Dr. Ray, who diagnosed her as suffering from severe depression and acute anxiety.

To allow her sufficient time to recover, on June 21, 1995 Plaintiff filed a request for leave pursuant to the Family and Medical Leave Act (FMLA). Defendant Department granted that request and provided Plaintiff leave from June 26, 1995 until September 15, 1995 (the maximum amount of leave authorized under that Act). See 29 U.S.C. § 2612(a)(1) (providing twelve weeks of leave under FMLA).

In early August 1995, Plaintiff requested forms so that she could participate in Defendant Department's voluntary annual leave transfer program. That program would have allowed Plaintiff to remain on paid leave by obtaining donated leave from other employees. Defendant Department refused to provide the forms directly to Plaintiff because she had obtained counsel; Defendant Department, instead, told Plaintiff to have her attorney contact it.[2]

Around September 12, 1995, Plaintiff wrote Defendant Department requesting that it extend her leave until January 15, 1996. On September 29, 1995, Defendant Department wrote back, informing Plaintiff that department policy allowed extended leave without pay, but only under two circumstances: (1) if the department could assure her a position of like status and pay at the same geographic location upon return, or (2) if the department could not make such assurances, but the employee waived his or her right

---

[2] Plaintiff did not receive the forms until September 30, 1995.

to return to such a position.   Defendant Department told Plaintiff that it could not assure her return to an equivalent position and, thus, it could grant her request for leave only if she waived her right to return to such a position.  Defendant Department placed Plaintiff on leave without pay until she submitted a completed request for extended leave.

On the same day that Defendant Department wrote back to Plaintiff, September 29, 1995, Plaintiff filed a charge with the EEOC alleging age and disability discrimination.[3] Thereafter, on October 16, 1995, Plaintiff submitted a request for extended leave without pay, as well as a request to participate in Defendant Department's voluntary annual leave transfer program.  With the requests, Plaintiff included letters from Dr. Ray and another of Plaintiff's doctors, Dr. Maestas, stating that Plaintiff was unable to work.  In the requests Plaintiff refused to waive her right to return to an equivalent position.  II App. at 182 ("I am unable to comply with your request to waive my rights to my position, pay and location upon return to work.").

On November 6, 1995, Defendant Department informed Plaintiff that it could not grant her request for extended leave without pay because she had not waived her right to return to an equivalent position.  Defendant Department therefore placed Plaintiff on "absent without leave" status.  See id. at 188;  I App. at 117 (employment policy) ("Failure by the employee to report to work upon the expiration of approved Family/Medical Leave will result in Absent Without Leave status, and may result in

---

[3] Plaintiff is not pursuing a claim of age discrimination in this action.

disciplinary action.") (emphasis in original). Defendant Department, however, gave

Plaintiff five working days from receipt of the letter to reconsider her decision not to

waive that right. Because Plaintiff was absent without leave, Defendant Department

refused to consider her request to participate in the voluntary annual leave transfer

program.

On November 7, 1995, Plaintiff filed another charge with the EEOC, this time

alleging that Defendant Department had retaliated against her for filing the first charge.

Two days later, Plaintiff again informed Defendant Department that she would not waive

her right to return to an equivalent position. In response, Defendant Department told

Plaintiff that it was considering dismissing her from her position for being absent without

leave. After repeated exchanges of correspondence between Plaintiff and Defendant

Department, Defendant Department dismissed Plaintiff on December 23, 1995. On that

same day, Plaintiff filed another charge with the EEOC alleging that she had been

terminated in retaliation for filing her previous charges with the EEOC.

**B**

On October 29, 1996, Plaintiff filed this action alleging that Defendants (1)

terminated her because of her disability in violation of the ADA, and (2) retaliated against

her because she had filed charges of discrimination with the EEOC in violation of Title

VII. See I App. at 1-5. Thereafter, Defendants moved for summary judgment. See I

App. at 33. On July 22, 1998, the district court granted Defendants' motion, holding that

Plaintiff could not prove: (1) that she was a "qualified individual with a disability" as required by the ADA, or (2) that she was retaliated against because she had filed charges with the EEOC as required by Title VII. See II App. at 342-44. This timely appeal ensued.

## II

### A

At oral argument, Defendants for the first time argued that the ADA does not validly abrogate the States' Eleventh Amendment immunity. Ordinarily the failure to raise an issue in the district court and in the opening brief to this court would waive the argument. See Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1385-86 (10th Cir. 1997) ("Generally, we will not consider an issue that was not raised and resolved in the trial court."), on rehearing, 148 F.3d 1196 (10th Cir. 1998). Claims of sovereign immunity, however, present an exception to that general rule. See In re Talbot, 124 F.3d 1201, 1205 (10th Cir. 1997) ("Although the general rule in the Tenth Circuit is that the court will not consider an issue raised for the first time on appeal, the United States' claim of sovereign immunity presents an exception to the general rule."); see also Mascheroni v. Board of Regents of University of California, 28 F.3d 1554, 1559 (10th Cir. 1994) ("We need not decide whether we are required or merely authorized to consider sua sponte the Eleventh Amendment's applicability because, in either event, the law is clear that we may consider whether the Eleventh Amendment bars Dr. Mascheroni's state law claims against

- 7 -

the Board of Regents.").

Supreme Court precedent and decisions of this court establish that deciding the Eleventh Amendment issue is not beyond our jurisdictional grasp and that the issue should be decided. In Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 466 (1945), the Supreme Court considered the "conduct" of the Indiana Attorney General in determining whether the state had waived its sovereign immunity from suit. The Attorney General had appeared in both the federal district court and the court of appeals where he defended the suit on the merits and without raising sovereign immunity as a defense. Only upon reaching the Supreme Court did the state first advance the Eleventh Amendment as a bar to federal court jurisdiction. Despite the fact that the Attorney General had waited until this ultimate stage in the proceedings before raising sovereign immunity as a defense, the Court nonetheless declared that "[t]his was in time." Id. at 467. The Eleventh Amendment, the Court concluded, "declares a policy and sets forth an explicit limitation on federal judicial power of such compelling force that this Court will consider the issue arising under this Amendment in this case even though urged for the first time in this Court." Id. (emphasis added).

Ford Motor Co. remains binding. Pennhurst State School & Hospital v. Halderman, 456 U.S. 89, 99 n.8 (1984) ("The limitation deprives federal courts of any jurisdiction to entertain such claims, and thus may be raised at any point in a proceeding."); Patsy v. Bd. of Regents of the State of Florida, 457 U.S. 496, 515 n.19

(1982) (noting that on remand the state may raise the Eleventh Amendment as a defense even though in earlier proceedings it had relied solely on alternative grounds and had "expressly requested that we . . . not pass on its potential Eleventh Amendment immunity"); Edelman v. Jordan, 415 U.S. 651, 677-78 (1974).

The decisions of this court and others are squarely in accord with Ford Motor Co. In Richins v. Industrial Construction, Inc., 502 F.2d 1051, 1056 (10th Cir. 1974), we answered the question "[c]an the Eleventh Amendment be waived by the attorney general of the state entering an appearance and litigating in the case . . .?" by concluding that "it cannot be so waived . . . absent some extraordinarily effective waiver." Id.(emphasis added); see also De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 121 (1st Cir. 1991) ("[T]he salience of the provision overrides ordinary notions of procedural default; an eleventh amendment defense may be raised for the first time even on appeal to the Supreme Court."); Aerojet-General Corp. v. Askew, 453 F.2d 819, 827-28 (5th Cir. 1971) (following Ford Motor Co. to hold that "defendants did not waive the right to claim immunity from suit under the Eleventh Amendment to the Constitution by defending on the merits in the district court" where the court of appeals on its own motion raised the sovereign immunity issue for the first time at oral argument).

Here, the defendants filed a motion to dismiss that did not include the defense of Eleventh Amendment immunity. We cannot conclude that in so doing the state's conduct was sufficiently extraordinary as to warrant a finding that the state effected a waiver of its

sovereign immunity. See Garcia v. Bd. of Education of the Socorro Consolidated School District, 777 F.2d 1403, 1405-06 (10th Cir. 1985) (per curiam) (holding that the state may raise the Eleventh Amendment as a defense at oral argument on appeal although it had raised sovereign immunity in its original answer but then later abandoned that defense); see also MacDonald v. Bd. of Regents of the University of Michigan, 371 F.2d 818, 819 (6th Cir. 1967) (per curiam) (applying Ford Motor Co. to reject Appellant's contention that the state's filing of an answer waives subsequent right to assert Eleventh Amendment immunity).

Accordingly, we conclude that we should consider Defendants' Eleventh Amendment immunity argument.

## B

As Defendants concede, this court's recent decision in Martin v. Kansas, 190 F.3d 1120 (10th Cir. 1999), held that the ADA validly abrogated the states' Eleventh Amendment immunity. After Martin, and after the briefing and oral argument of this appeal, the Supreme Court decided Kimel v. Florida Bd. of Regents, 120 S. Ct. 631 (2000), on January 11, 2000. There the Court held that the Age Discrimination in Employment Act, 29 U.S. §§ 621-634, did not validly abrogate the States' Eleventh Amendment immunity. As noted we then requested further briefing to determine the status of Martin in light of Kimel. We have considered those further briefs and turn now

to our resolution of the Eleventh Amendment question.[4]

"In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions:  first, whether Congress has unequivocally expressed its intent to abrogate the immunity, and second, whether Congress has acted pursuant to a valid exercise of power."  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996) (citation, alteration, and internal quotation marks omitted).  As Martin noted, there is no doubt that Congress passed the first hurdle when it enacted the ADA which provided: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202; Martin, 190 F.3d at 1126-27; see also H. Rep. No. 101-485(IV), at 70, reprinted in 1990 U.S.C.C.A.N. 512, 559 ("Consistent with the requirements set forth in Atascadero State Hospital v. Scanlon, 473 U.S.234 (1985), this section specifies that a State shall not be immune under the 11th Amendment. . . .").

The dispositive issue here is whether Congress "acted pursuant to a valid exercise of power" when it enacted the ADA.  Congress purported to pass the ADA pursuant to two Constitutional provisions: Article I, Section 8 (the Commerce Clause) and Section 5

---

[4]  We note that the Supreme Court has granted certiorari in a case involving  whether the ADA validly abrogates the states' Eleventh Amendment immunity.  See University of Alabama at Birmingham Bd. of Trustees v. Garrett, 120 S. Ct. 1669 (2000).  Plaintiff and the United States urge us to stay this case pending the Court's decision in Garrett.

The Court granted certiorari on two earlier occasions to resolve the same question, only to have the cases settle.  We previously stayed this case pending the decisions in those cases.  Given the uncertainty whether the Court will actually decide the question this time in a manner dispositive here, we decline to stay this case again.

of the Fourteenth Amendment. See 42 U.S.C. § 12101(b)(4) ("It is the purpose of this [Act] . . . to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce . . . ."). In Seminole Tribe, 517 U.S. at 72, the Supreme Court held that Congress cannot validly abrogate the state's Eleventh Amendment immunity under its Article I powers. Therefore, Congress could validly abrogate the States' Eleventh Amendment immunity, if at all, only pursuant to Section 5 of the Fourteenth Amendment.

C

The Supreme Court's current test for congressional abrogation of the States' immunity under Section 5 of the Fourteenth Amendment originated in City of Boerne v. Flores, 521 U.S. 507 (1997). There, a municipality challenged the constitutionality of the Religious Freedom Restoration Act (RFRA). Congress had passed RFRA in response to the Court's decision in Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), which had held that a neutral, generally applicable law ordinarily would not violate the Free Exercise Clause. By enacting RFRA, Congress sought "to restore the compelling interest test . . . and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b).

In City of Boerne, the Court held that Congress in RFRA had exceeded its power under Section 5 of the Fourteenth Amendment:[5]

---

[5] Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

> Congress' power under § 5 . . . extends only to "enforc[ing]" the provisions of the Fourteenth Amendment. The Court has described this power as "remedial." The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. . . .

City of Boerne, 521 U.S. at 519 (alterations in original). To protect against impermissible attempts by Congress to determine the substance of the Fourteenth Amendment, the Court adopted a congruence and proportionality test: "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. at 520.

Under this congruence and proportionality test, "[t]he appropriateness of the remedial measure must be considered in light of the evil presented." Id. at 530. "Strong measures appropriate to one harm may be an unwarranted response to another, lesser one." Id. The Court therefore looked first to the legislative history of RFRA to determine the extent of the "evil." According to the Court, "RFRA's legislative record lacks examples of modern instances of generally applicable laws passed because of religious bigotry." Id. at 530. Thus, the legislative history did not demonstrate a pattern or practice of unconstitutional action and therefore it did not demonstrate a particularly pernicious "evil." See, e.g., id.

"Regardless of the state of the legislative record," the Court held that "RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning":

> Remedial legislation under § 5 should be adapted to the mischief and wrong which the Fourteenth Amendment was intended to protect against.
>
> RFRA is not so confined. Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter.

Id. at 532. RFRA failed the "congruence and proportionality" test:

> The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden on his free exercise, the State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest.

Id. at 533-35. Accordingly, the Court held that RFRA was not a valid exercise of Congress's power under Section 5. See id. at 535.

The Court applied the congruence and proportionality test again two terms later in Florida Prepaid Postsecondary Education Expense Bd. v. College Savings Bank, 119 S. Ct. 2199 (1999). There the Court addressed whether the Patent Remedy Act validly abrogated the states' Eleventh Amendment immunity. Following City of Boerne, the Court held that it "must first identify the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy. . . ." Florida Prepaid, 119 S. Ct. at 2207. With the Patent Remedy Act Congress sought to remedy the States' infringement of patents and their use of sovereign immunity to deny the patent holders compensation for the infringement. See id. "In enacting the Patent Remedy Act, however, Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations." Id. The

- 14 -

Court said:

> The legislative record . . . suggests that the Patent Remedy Act does not respond to a history of "widespread and persisting deprivation of constitutional rights" of the sort Congress has faced in enacting proper prophylactic § 5 legislation. City of Boerne, 521 U.S. at 526. Instead, Congress appears to have enacted this legislation in response to a handful of instances of state patent infringement that do not necessarily violate the Constitution. Though the lack of support in the legislative record is not determinative, see id. at 531, identifying the targeted constitutional wrong or evil is still a critical part of our § 5 calculus because "[s]trong measures appropriate to address one harm may be an unwarranted response to another, lesser one." id. at 530. Here, the record at best offers scant support for Congress' conclusion that States were depriving patent owners of property without due process of law by pleading sovereign immunity in federal-court patent actions.

Id. at 2210 (alteration in original). Because there was little evidence of constitutional violations by the states, the Court held that the provisions of the Patent Remedy Act were "out of proportion to a supposed remedial or preventative object." Florida Prepaid, 119 S. Ct. at 2210.

After City of Boerne,[6] a number of circuits, including our circuit, applied the congruence and proportionality test to the ADA.[7] See Garrett v. University of Alabama at

---

[6] Before Boerne, the Seventh Circuit had held that Congress validly abrogated the states' Eleventh Amendment immunity when it enacted the ADA. See Crawford v. Indiana Dep't of Corrections, 115 F.3d 481, 487 (7th Cir. 1997).

[7] We note that the Supreme Court applied the ADA to the states in Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206 (1998). The Court, however, reserved the question whether the ADA exceeded Congress' power under Section 5 of the Fourteenth Amendment. See id. at 212 ("We do not address another issue presented by petitioners: whether application of the ADA to state prisons is a constitutional exercise of Congress's power under . . . § 5 of the Fourteenth Amendment.").

Birmingham Bd. of Trustees, 193 F.3d 1214, 1218 (11th Cir. 1999), cert. granted, 120 S. Ct. 1669 (2000); Dare v. California, 191 F.3d 1167, 1174 (9th Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3566 (U.S. 2000); Martin, 190 F.3d at 1127-28; Mueller v. Costello, 187 F.3d 298 (2d Cir. 1999); Kimel v. Florida Bd. of Regents, 139 F.3d 1426, 1433 (11th Cir. 1998), aff'd on other grounds, 120 S. Ct. 631 (Jan. 11, 2000);[8] Coolbaugh v. Louisiana, 136 F.3d 430, 438 (5th Cir), cert. denied, 119 S. Ct. 58 (1998); Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997), cert. denied sub. nom. Wilson v. Armstrong, 118 S. Ct. 2340 (1998).  Most circuits, including ours, held that the ADA validly abrogated the States' Eleventh Amendment immunity.[9]  The circuits essentially followed the same approach that this court used in Martin.

In Martin we relied on three principle reasons to distinguish the ADA from RFRA.

---

[8] The Eleventh Circuit in Kimel held that Congress had validly abrogated the States' Eleventh Amendment immunity when it passed the ADA, but not when it passed the ADEA. The parties filed separate petitions for certiorari involving the statutes.  The Supreme Court granted the petition for certiorari on the ADEA claim, see 525 U.S. 1121 (1999), and affirmed the Eleventh Circuit, albeit on a different basis, see 120 S. Ct. at 631, 640.  The Supreme Court also granted certiorari to resolve the ADA question, see Florida Dept of Corrections v. Dickson, 120 S. Ct. 976 (2000), but dismissed the writ after the parties settled that case, 120 S. Ct. 1236.

[9] The Eighth Circuit held that the ADA did not validly abrogate the states' Eleventh Amendment immunity.  See Alsbrook v. City of Maumelle, 184 F.3d 999, 1010 (8th Cir. 1999) (en banc), cert. granted in part, 120 S. Ct. 1265, cert. dismissed, 120 S. Ct. 1265 (2000); Debose v. Nebraska, 186 F.3d 1087, 1088 (8th Cir.), republished at 207 F.3d 1020 (8th Cir.), petition for cert. filed, 68 U.S.L.W. 3391 (Dec. 1, 1999).  Panels of the Fourth Circuit have split on the question.  Compare Amos v. Maryland Dep't of Public Safety and Correction Services, 178 F.3d 212, 220 (4th Cir. 1999) (holding that the ADA validly abrogated the States' Eleventh Amendment immunity), vacated on other grounds, 205 F.3d 687 (4th Cir. 2000), with Brown v. North Carolina Division of Motor Vehicles, 166 F.3d 698, 707-08 (4th Cir. 1999) (holding that the ADA did not validly abrogate the States' Eleventh Amendment immunity).

We first held the ADA was designed to remedy a strong "evil" or "wrong." See Martin, 190 F.3d at 1127-28. The Supreme Court in City of Clebourne v. Clebourne Living Center, 473 U.S. 432 (1985), had held that the Equal Protection Clause prohibited arbitrary discrimination against the disabled. Martin, 190 F.3d at 1128. "Thus, under Clebourne, the disabled are protected by Fourteenth Amendment, and Congress is entitled to enforce this protection against the states." Id. Moreover, "Congress, when it enacted the ADA, made numerous findings of fact regarding the pervasiveness of discrimination against disabled persons." Id. at 1127.

In light of this strong "evil," the ADA was "congruent and proportional." See id. at 1128. We held that, "[t]he Act only prohibits discrimination against 'qualified individuals,' and it requires only 'reasonable accommodations' that do not impose an 'undue burden' on the employer." Id. at 1128. Martin therefore concluded that:

> The ADA, unlike RFRA, is not attempting to impose a strict scrutiny standard on all state laws or actions in the absence of evidence of discrimination.... Rather, the ADA seeks to impose a scheme that will adequately prevent or remedy a well-documented problem of discrimination without unduly burdening the state prison system. It subjects some laws and official actions to a "reasonable accommodation" requirement only to the point that the accommodation is not unduly burdensome. Such a scheme, unlike RFRA, does not redefine or expand [disabled persons'] constitutional protections, but simply proportionally acts to remedy and prevent documented constitutional wrongs.

Id. (citation and internal quotation marks omitted) (alteration in original).

**D**

After our decision in <u>Martin</u>, the Supreme Court in January 2000 analyzed whether

the ADEA validly abrogated the States' Eleventh Amendment immunity in <u>Kimel</u>, 120 S.

Ct. 631, 645-50 (2000).  As in <u>City of Boerne</u> and <u>Florida Prepaid</u>, the Court again

applied the congruence and proportionality test.  Unlike <u>City of Boerne</u> and <u>Florida</u>

<u>Prepaid</u>, however, in <u>Kimel</u>, 120 S. Ct. at 645, the Court focused its attention on the Equal

Protection Clause.  The Court first noted that it had, on three previous occasions, held that

age discrimination claims did not establish violations of the Equal Protection Clause.

<u>See</u> <u>id.</u> (citing <u>Gregory v. Ashcroft</u>, 501 U.S. 452 (1991); <u>Vance v. Bradley</u>, 440 U.S. 93

(1979); <u>Massachusetts Bd. of Retirement v. Murgia</u>, 427 U.S. 307 (1976) (per curiam)).

More importantly, the Court noted that age discrimination victims were not a discrete

class and therefore claims of such discrimination were subject only to rational basis

review.  <u>Kimel</u>, 120 S. Ct at 645-46.  The Court highlighted the importance of the nature

of scrutiny to be applied by the courts:

> States may discriminate on the basis of age without offending the
> Fourteenth Amendment if the age classification in question is rationally
> related to a legitimate state interest.  The rationality commanded by the
> Equal Protection Clause does not require States to match age distinctions
> and the legitimate interests they serve with razorlike precision. . . .In
> contrast, when a State discriminates on the basis of race or gender, we
> require a tighter fit between the discriminatory means and the legitimate
> ends they serve.  Under the Fourteenth Amendment, a State may rely on
> age as a proxy for other qualities, abilities, or characteristics that are
> relevant to the State's legitimate interests.  The Constitution does not
> preclude reliance on such generalizations.

Id. at 646 (citations omitted) (alterations in original).

The Court then considered the ADEA "against this backdrop" of the Equal Protection Clause and held that the Act was "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." Id. at 647 (quoting City of Boerne, 521 U.S. at 532). Specifically, the ADEA "makes unlawful, in the employment context, all discriminat[ion] against any individual . . . because of such individual's age." See id. (quoting 29 U.S.C. § 623 (a)(1)) (alterations in original). Accordingly, "[t]he Act, through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection, rational basis standard." Kimel, 120 S. Ct. at 647.

The Court said the ADEA's exceptions did not solve this problem. Section 623 (f)(1) does allow employers to rely on age when it "is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of the particular business." Kimel, 120 S. Ct. at 647. This defense, however, was "a far cry from the rational basis standard we apply to age discrimination under the Equal Protection Clause." Id. Moreover, "[u]nder the ADEA, even with its BFOQ defense, the State's use of age is prima facie unlawful." Id. Application of the ADEA thus starts with a presumption in favor of requiring the employer to make an individualized determination.

The Court next noted that the ADEA (§ 623 (f)(1)) allows employers to engage in

behavior otherwise prohibited by the Act "where the differentiation is based on reasonable factors other than age." Kimel, 120 S. Ct. at 648. "Under the Constitution, in contrast, States may rely on age as a proxy for other characteristics." Id. This defense therefore "merely confirms that Congress, through the ADEA, has effectively elevated the standard for analyzing age discrimination to heightened scrutiny." Id.

The Court concluded that "the ADEA prohibits very little conduct likely to be held unconstitutional." Id. The Court said that this fact,

> while significant, does not alone provide the answer to our § 5 inquiry. Difficult and intractable problems often require powerful remedies, and we have never held that § 5 precludes Congress from enacting reasonably prophylactic legislation. Our task is to determine whether the ADEA is in fact just such an appropriate remedy or, instead, merely an attempt to substantively redefine the State's legal obligations with respect to age discrimination. One means by which we have made such a determination in the past is by examining the legislative record containing the reasons for Congress' action. . . "The appropriateness of remedial measures must be considered in light of the evil presented." "Strong measures appropriate to one harm may be an unwarranted response to another, lesser one."

Kimel, 120 S. Ct. at 649 (quoting City of Boerne, 521 U.S. at 530).

The Court examined the legislative record and concluded that "Congress never identified any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violations." Id. at 648-49. At best, the evidence of discrimination by the States consisted of "isolated sentences clipped from floor debates and legislative reports," which was plainly insufficient. See id. at 649. Finally, although the Court accepted the fact that Congress "found substantial age

discrimination in the private sector, the Court held that this evidence was "beside the point," since "Congress made no such findings with respect to the States." Kimel, 120 S. Ct. at 649. "A review of the ADEA's legislative record as a whole, then, reveals that Congress had virtually no reason to believe that state and local governments were unconstitutionally discriminating against their employees on the basis of age. . . . Congress' failure to uncover any significant pattern of unconstitutional discrimination here confirms that Congress had no reason to believe that broad prophylactic legislation was necessary in this field." Id. at 649-50.

Accordingly the Court in Kimel held that the ADEA did not validly abrogate the States' Eleventh Amendment immunity.

**E**

The Second, Third, and Seventh Circuits have now analyzed whether Kimel required them to revise their previous rulings concerning the ADA and the Eleventh Amendment. These courts have reached contrary conclusions. Compare Lavia v. Pennsylvania Dep't of Corrections, 2000 WL 1121553 (3d Cir. 2000); Erickson v. Bd. of Governors of State Colleges and Universities for Northeastern Illinois Univ., 207 F.3d 945, 948 (7th Cir. 2000) ("The Supreme Court's opinion in Kimel calls all of these decisions into question, and we think it best to analyze the subject afresh rather than to rehash pre-Kimel conclusions in and out of this circuit."), and Cooley v. Mississippi Dept. of Transp., 96 F. Supp.2d 565, 568 (S.D. Miss. 2000) ("Despite its contrary holding prior

to Kimel, this Court predicts that, if faced with this issue again, the Fifth Circuit would follow reasoning similar to that of the Seventh Circuit and hold that states are immune from damages suits under the ADA."), with Kilcullen v. New York State Dep't of Labor, 205 F.3d 77, 81 (2d Cir. 2000) ("[T]his court has already determined that [the ADA is legitimate remedial legislation]. New York's protestations notwithstanding, that decision is controlling here.") (citation omitted). Judge Kimball, one of our Tenth Circuit District Judges has recently made a scholarly survey of this law and has held the ADA's abrogation of state Eleventh Amendment immunity valid, following our Martin holding. See Davis v. Utah State Tax Comm'n, 96 F. Supp.2d 1271, 1279 (D. Utah 2000) ("The Kimel Court merely applied the previous tests that it had announced in Seminole Tribe and refined in City of Boerne. Because the Tenth Circuit applied the very test that Kimel requires, Martin is still good law that must be followed by this court.").

For reasons we will explain, we are persuaded by the views in Kilcullen, in the dissent of Judge Wood in Erickson, and in Judge Kimball's Davis opinion. We feel that Martin's conclusion on the validity of the ADA's abrogation of Eleventh Amendment immunity remains sound and need not be altered because of the analysis in Kimel. Our reasons follow.

The Second Circuit's opinion concerned an epilepsy victim with a learning disability. Kilcullen, 205 F.3d at 77. His suits under the ADA, the Rehabilitation Act and New York law challenged his discharge from the New York Department of

Transportation under both the federal and state laws and alleged that application forms of the Department violated the ADA, Section 504 of the Rehabilitation Act, and New York law also by posing questions about his disability. His suit was dismissed on the ground that the Eleventh Amendment bars federal courts from considering claims against the States under the provisions in question. The Kilcullen opinion dealt with an appeal of one of Kilcullen's suits.

The Second Circuit rejected the State's analysis and held that state agencies are not immune from suit in federal court to enforce the rights guaranteed in Section 504 of the Rehabilitation Act. The Rehabilitation Act of 1973 and the 1992 ADA, while not absolutely congruent in their other requirements, do impose identical obligations on employers. Kilcullen, 205 F.3d at 79, n.1. Kilcullen noted the two part test set forth in Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55 (1996), for determining whether an act of Congress validly abrogates States' sovereign immunity: (1) Congress must unequivocally express its intent to abrogate the immunity; and (2) Congress must act pursuant to a constitutional provision granting it the power to abrogate. Kilcullen, 205 F.3d at 79.

As to the second prong set out above, Kilcullen said that recent Supreme Court precedent has clarified that Congress may not abrogate State sovereign immunity pursuant to its Article I powers, but it may do so pursuant to Section 5 of the Fourteenth Amendment and its enforcement power there granted. New York conceded the

unequivocal expression of Congress' intent to abrogate State sovereign immunity, but argued that the second Seminole Tribe requirement was not met since Congresss was not acting pursuant to a valid exercise of its Section 5 enforcement powers when it adopted the Rehabilitation Act.

More specifically New York later argued that Congress' abrogation was invalid because it had not yet developed a sufficient legislative record demonstrating the Rehabilitation Act was appropriate to enforce the Fourteenth Amendment. Kilcullen, 205 F.3d at 80. The Second Circuit rejected New York's objection to consideration of the subsequently accumulated legislative record when it assessed whether the Rehabilitation Act constituted remedial legislation. Id. Courts "have always been free to consider evidence beyond that which is contained in the legislative record." Id. See Turner Broadcasting Systems v. FCC, 520 U.S. 180, 200 (1997). And the Second Circuit, noting the statement in Florida Prepaid, 119 S. Ct. at 2210, that "lack of support in the legislative record is not determinative," concluded that the Supreme Court "has never established a procedural requirement that Congress document in detail its reasons for adopting the statute." Kilcullen, 205 F.3d at 80.

"The ultimate question remains not whether Congress created a sufficient legislative record, but rather whether, given all of the information before the Court, it appears that the statute in question can appropriately be characterized as legitimate remedial legislation." Id. Kilcullen concluded that examining "the legislative record

Congress compiled in its hearings on the ADA, this court has already determined that the substance of these twin statutes [the ADA and the Rehabilitation Act] can be so characterized." (citing Muller v. Costello, 187 F.3d 298, 308-11 (2d Cir. 1999)). Kilcullen concluded that in light of identical provisions in the ADA and the Rehabilitation Act, a single question was presented for review and held that Congress "validly abrogated the States' immunity from suit under both the ADA and Section 504 of the Rehabilitation Act." Kilcullen, 205 F.3d at 82.

In Erickson v. Bd. of Governors, 207 F.3d 945 (7th Cir. 2000), the Seventh Circuit held, inter alia, that Title I of the ADA does not "enforce" the Fourteenth Amendment and therefore the Eleventh Amendment bars suit in the federal courts against the States and arms of the States. The majority opinion in Erickson noted that the legislative findings concerning the ADA "contain not one word about state governments," id. at 951, and that legislative statements, as in Kimel, consist "almost entirely of isolated sentences clipped from floor debates and legislative reports." (quoting Kimel, 120 S. Ct. at 649). The Seventh Circuit majority therefore concluded that the ADA does not enforce the Fourteenth Amendment and that private litigation against the States is blocked in the federal courts. Erickson, 207 F.3d at 952. Judge Wood dissented, finding critical distinctions between the ADEA and the ADA. For cogent reasons which she articulates, Judge Wood concludes that the ADA was a permissible exercise of Congress's Section 5 power with ample support in the legislative record. It is convenient to detail the reasoning of Judge Wood later after

we discuss the Third Circuit's <u>Lavia</u> opinion.

In <u>Lavia</u>, a Commonwealth of Pennsylvania Corrections Department employee sued alleging harassment and termination of his employment. Lavia had suffered from a seizure and had been diagnosed with CNS Vasculitis of the brain and Lavia alleged his condition rendered him "disabled." He sought reinstatement, damages and other relief under the ADA, the Vocational Rehabilitation Act and the Pennsylvania Human Relations Act. The latter claim was dismissed by the District Court under the Eleventh Amendment but not the federal claims. The Commonwealth appealed, challenging Lavia's claim under the ADA.

The Third Circuit focused on the validity of Congressional abrogation of the Eleventh Amendment immunity of the Commonwealth. The court held the first requirement for abrogation was met by the express statement of the ADA on abrogation. It was held, however, that the Congress did not act in doing so within the proper exercise of its power. Article I powers, including those under the Commerce Clause, do not support abrogation. Section 5 power to enforce the Fourteenth Amendment was held unavailing also. The <u>Lavia</u> opinion said that since Congress is only authorized to exercise its Section 5 power to remedy constitutional violations by the States, and not by private members of society and the community, and because there is no evidence of State violations, Congress did not validly abrogate the States' Eleventh Amendment immunity. 2000 WL 1121553, *9.

<u>Lavia</u> dismisses Judge Wood's views as merely "forceful and interesting" but says

they do not call for a different result than Lavia's invalidation of the ADA abrogation provision. 2000 WL 1121553, \*10. We disagree.

We are persuaded by the dissent of Judge Wood in Erickson, id. at 952-61, and not by the Erickson majority opinion or by Lavia. Judge Wood considered and discussed Kimel at length, 207 F.3d at 954 et seq., concluding that "Congress legitimately used its power under section 5 of the Fourteenth Amendment when it made the ADA applicable to the states." Id. at 954. She noted the requirement from Florida Prepaid, 119 S. Ct. at 2205, that there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." (quoting from City of Boerne, 521 U.S. at 519-20). Judge Wood pointed out that the Erickson majority opinion "ignores the express holding of Kimel that 'we have never held that section 5 precludes Congress from enacting reasonably prophylactic legislation.' 120 S. Ct. at 648." 207 F.3d at 955.

Judge Wood's dissent found critical distinctions between the ADEA (which Kimel held to have invalidly attempted to abrogate Eleventh Amendment immunity) and the ADA, which Judge Wood found valid in its abrogation of the immunity. She said Kimel observed that older persons have not been subjected to a history of purposeful unequal treatment. Id. at 956. Judge Wood pointed out that, in contrast, Congress found in the ADA that disabled persons have been subjected to a history of purposeful unequal treatment in critical areas such as employment, transportation, communication, recreation, institutionalization, health services, voting, and access to public services. Id. at 956. Thus

in the ADA's statement of "Findings," Congress provided a litany of areas in which it found that the disabled suffer discrimination.[10]  For purposes of deciding whether Congress validly abrogated state sovereign immunity in enacting the ADA, Congress's "Findings" are especially significant for the extent to which several of its enumerated areas are largely, or even entirely, the domain of the states.  For instance, Congress found that discrimination exists in "education."  As Judge Wood noted in her dissent in Erickson, "Education in this country is overwhelmingly an enterprise of state and local government," and that a full ninety percent of elementary and secondary school students attend public schools. Erickson, 207 F.3d at 957 & n.3 (Wood, J., dissenting).  Given the clear public nature of education, we agree with Judge Wood that the inclusion of "education" among the areas in which Congress found discrimination against the disabled demonstrates a congressional finding of state discrimination.

The inclusion of "education" is not unique in this regard.  As Judge Wood's dissent demonstrates, Congress's enumeration of "transportation" and "health services," both of which entail heavy state and local government involvement, likewise represents a congressional finding that the states themselves engage in discrimination against the disabled.  Id. at 957-58 & nn. 4-5 (Wood, J., dissenting).

Congress's list of areas of discrimination is not limited to those largely or

_____

[10]42 U.S.C. § 12101 states in pertinent part: "The Congress finds . . discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services. . ."

predominantly controlled by the states. The litany of areas also includes those that unambiguously are under the exclusive domain of the states. In this regard we note Congress's finding that the disabled are subject to discrimination in "voting." As the conduct of elections is within the exclusive purview of the states, Congress's decision to include "voting" again demonstrates a congressional finding of discrimination by the States.

We conclude that contrary to Lavia's holding that the statute lacks a legislative history or congressional findings of discrimination against the disabled by the states, Congress did in fact make findings of state discrimination. Having delineated areas infected by state discrimination against the disabled, Congress properly sought to remedy and prevent the recurrence of such discrimination. See 42 U.S.C. § 12101(a) (4) ("[U]nlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability often had no legal recourse to redress such discrimination. . ."). To do so, Congress validly abrogated the states' sovereign immunity by invoking its power under Section 5 in a manner proportionate and congruent to the violations Congress had identified. Kimel, 120 S. Ct. 631 (2000).

The dissent of Judge Wood concludes that these and other reasons demonstrate that the ADA is a permissible exercise of Congress's section 5 power, and that the ADA and the ADEA "fare quite differently under the proportionality analysis required by Boerne and

Kimel." Erickson, 207 F.3d at 956 (Wood, J., dissenting). The dissent reasons that it was the broad sweep of the ADEA that caused the Supreme Court to find it was not a proportional response to the problem of age discrimination (the ADEA prohibiting all employment discrimination on the basis of age against persons over 40, the protected class, with only limited tempering of the restriction where an employer shows a substantial basis for believing all or nearly all employees over a given age lack qualifications or because individual testing is highly impractical). Id. at 957. In contrast, Judge Wood's dissent points to the ADA's "more nuanced approach to the problem of disability discrimination." Id. An employer making distinctions on the basis of disability need only show that reasonable steps of accommodation will not work. See 42 U.S.C. §§ 12111, 12113. This leads to the dissent's conclusion that the ADA meets the first part of Kimel's analysis -- proportionality. 207 F.3d 955-57.

The dissent then considers the second Kimel question -- whether the legislative record reveals either a pattern of age discrimination committed by the states or "any discrimination whatsoever that [rises] to the level of constitutional violation. " Id. at 957. The legislative record is found to be admittedly sparse on findings pertaining specifically to state behavior. The dissent focuses, however, on the fact that

> . . .the House Report notes that "inconsistent treatment of people with disabilities by different state or local government agencies is both inequitable and illogical." H. R. Rep. No. 101-485 (II), U. S. Code Cong. & Admin. News at 319. More importantly, the express congressional findings with respect to pervasive discrimination address many areas that are controlled to a significant degree by state and local governments. For example, Congress

> identified discrimination in education as a particular problem.

> Education in this country is overwhelmingly an enterprise of state and local government. Another sector singled out in the statute was health services, in which state and local governments also play a powerful role. The story is similar for transportation, which is also mentioned in § 12101(3). Congress's specific attention to sectors with such a substantial state and local governmental presence indicates that it knew that government action at the state level was an important part of the problem it was addressing.

Id. at 957-58 (emphasis added). Moreover the dissent points out that other evidence the Kimel Court found lacking for the ADEA -- "a record of discrimination that reveals constitutional violations -- is present in abundance for the ADA." Id. at 958. The findings cited by the dissent are reproduced in the Appendix to this opinion.

As noted, in Davis v. Utah State Tax Commission, 96 F. Supp. 2d 1271 (D. Utah 2000), Judge Kimball thoroughly analyzed the Eleventh Amendment issue. He agreed, as we do, with the dissent of Judge Wood in Erickson and restated her analysis at length. We need not repeat his recitation of her views, and merely note our agreement with the analysis laid out in the Davis opinion on the Eleventh Amendment issue. We express no view on other issues which the Davis opinion deals with.

In sum, from our consideration of Kimel and the subsequent opinions we have analyzed above, Kilcullen, Judge Wood's dissent in Erickson, and Davis, we are convinced that this court's opinion in Martin remains sound and that no subsequent Supreme Court or other precedent calls for us to revise the conclusions expressed therein. Accordingly, we hold that the ADA validly abrogated Eleventh Amendment immunity so that Plaintiff's

- 31 -

ADA claims against the defendants are not barred by the immunity.

# III

We review <u>de novo</u> the district court's grant of summary judgment to determine whether it correctly applied the law and whether, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact.  <u>See</u> <u>United States ex rel. Hafter v. Spectrum Emergency Care, Inc.</u>, 190 F.3d 1156, 1160 (10th Cir. 1999).

Plaintiff argues vigorously that Defendants caused her disability and otherwise discriminated against her because of her disability.[11]  <u>See</u> Appellant's Brief In Chief at 12-16.  The ADA, however, does not prohibit all disability discrimination.  Instead, the Act bars discrimination only against a "qualified individual with a disability": "No covered entity shall discriminate against a <u>qualified individual with a disability</u> because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis added).  Therefore, even if Defendants discriminated against Plaintiff, if Plaintiff was not a "qualified individual with a disability," then the ADA provides no redress for that wrong.  <u>See, e.g.</u>, <u>Smith v. Blue Cross Blue Shield</u>, 102 F.3d 1075, 1077-78 (10th Cir. 1996).

---

[11]  For the purposes of this appeal, Defendants concede that Plaintiff, in fact, is disabled.  We therefore do not address that part of the <u>prima facie</u> case.

- 32 -

The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. . . ." 42 U.S.C. § 12111(8). This court has adopted a two-part test for determining whether a disabled person meets that requirement:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

Hudson v. MCI Telecommunications Corp., 87 F.3d 1167, 1168 (10th Cir. 1996) (citation and internal quotation marks omitted); see also White v. York Int'l Corp., 45 F.3d 357, 361-62 (10th Cir. 1995) (same). "The determination as to whether an individual is a 'qualified individual with a disability' must be made as of the time of the employment decision." Nowak v. St. Rita High Sch., 142 F.3d 999, 1003 (7th Cir. 1998); see also Smith, 102 F.3d at 1077 (stating a similar proposition).[12]

As demonstrated above, Plaintiff's disability prevented her from attending work. Attendance is generally an "essential" function of any job. See Nowak, 142 F.3d at 1003 ("Obviously, an employee who does not come to work cannot perform the essential

---

[12] Thus, Defendant's evidence that Plaintiff is still unable to work is not relevant to the question whether she was a "qualified individual with a disability" at the time of the challenged discrimination.

functions of his job."); <u>Rogers v. Int'l Marine Terminals, Inc.</u>, 87 F.3d 755, 759 (5th Cir. 1996) ("[A]n essential element of any job is an ability to appear for work. . . .") (citation, alteration, and internal quotation marks omitted).  Indeed, Plaintiff concedes that attendance is ordinarily an essential function of her job.  <u>See</u> Appellant's Brief In Chief at 11.

Because Plaintiff cannot perform an essential function of her position, we must "determine whether any reasonable accommodation by the employer would enable [her] to perform those functions."  <u>Hudson</u>, 87 F.3d at 1168.  It is well-settled that a request for leave may lead to a "reasonable" accommodation – such a request may allow an employee sufficient time to recover from an injury or illness such that the employee can perform the essential functions of the job (i.e., attend work) in the future.  <u>See</u> 29 C.F.R. Pt. 1630, Appendix to Part 1630 – Interpretative Guidance to Title I of the ADA, § 1630.2(o) (Examples of possible accommodations include "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment."); <u>see also</u> <u>Taylor v. Pepsi-Cola Co.</u>, 196 F.3d 1106, 1110 (10th Cir. 1999) ("An allowance of time for medical care or treatment may constitute a reasonable accommodation.") (citation and internal quotation marks omitted); <u>Rascon v. U.S. West Communications, Inc.</u>, 143 F.3d 1324, 1334 (10th Cir. 1998) (stating the same rule); <u>Hudson</u>, 87 F.3d at 1168 (stating a similar proposition).

However, "[t]he term 'reasonable accommodation' refers to those accommodations which presently, or in the <u>near future</u>, enable the employee to perform the essential

functions of his job." Hudson, 87 F.3d at 1169 (citation and internal quotation marks omitted) (emphasis added); see also Meyers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (stating the same proposition). Accordingly, a request for indefinite leave cannot constitute "reasonable" accommodation – such a leave request does not allow the employee to perform the essential functions of the job in the near future.[13] Plaintiff suggests, however, that she did not request indefinite leave. See Appellant's Brief In Chief at 16. Instead, she requested leave for a finite period of time: from November 1995 to January 1996. See id. According to Plaintiff, she therefore requested a "reasonable" accommodation pursuant to this court's precedent. See, e.g., id.

Contrary to Plaintiff's argument, this court has required an employee to provide an expected duration of the impairment (not the duration of the leave request). See Hudson, 87 F.3d at 1169 ("This court agrees with plaintiff that a reasonable allowance of time for medical care and treatment may, in appropriate circumstances, constitute a reasonable accommodation. In this case, however, plaintiff has failed to present any evidence of the expected duration of her impairment as of the date of her termination."); see also Taylor, 196 F.3d at 1110 (stating a similar proposition); Rascon, 143 F.3d at 1334 (stating a similar

---

[13] Other circuits have adopted similar requirements. See Nowak, 142 F.3d at 1004 (7th Cir.) ("The ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence."); see also Mitchell v. Washington Cent. Sch. Dist., 190 F.3d 1, 9 (2d Cir. 1999) (stating a similar proposition); Watkins v. J & S Oil Co., Inc., 164 F.3d 55, 62 (1st Cir. 1998) (similar); Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1225 (11th Cir. 1997).

proposition); Smith, 102 F.3d at 1077 (stating a similar proposition). Without an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a "reasonable" accommodation. See, e.g., Hudson, 87 F.3d at 1169. For example, in Rascon an employee submitted evidence from his doctor that the expected duration of his treatment was four months and his prognosis for recovery was "good." See 143 F.3d at 1334. In the circumstances, the court held that the employee's request for leave to seek treatment for his illness constituted "reasonable" accommodation. See id.

In Hudson, 87 F.3d at 1169, on the other hand, the employee submitted some evidence that she was not permanently disabled. The employee, however, failed to provide any evidence of the expected duration of the impairment. See id. In such circumstances the court held that the employee failed to create a triable issue of fact regarding the "reasonableness" of her requested leave. See id.; see also Taylor, 196 F.3d at 1110 ("As in Hudson, Plaintiff failed to present evidence of the expected duration of his impairment."); Smith, 102 F.3d at 1077 (rejecting the plaintiff's ADA claim, because "[a]s of the date of her replacement or termination, Smith had presented no evidence of the expected duration of her complete disability").

The district court correctly concluded that, as in Hudson, Taylor, and Smith, Plaintiff failed to prove the expected duration of her illness and thereby the "reasonableness" of her request for leave. See II App. at 342 ("Because she has not established if and when she

could return to work, she has not established that she is a qualified individual."). As noted above, Plaintiff submitted letters from her doctors when she requested extended leave. The first letter, from Dr. Ray, stated that Plaintiff "remains unable to return to work. It is uncertain when she may be capable of returning to work." Id. at 184 (emphasis added). The second letter, from Dr. Maestas, states that "[m]edically, [Plaintiff] is to be considered unable to maintain any type of job duties and should be considered temporarily disabled. The duration of the above illnesses are unknown, however, she will be followed very closely in this office and should be excused from any and all work until January of 1996." Id. at 185 (emphasis added).

Thus the letters state that the duration of the illness is both "uncertain" and "unknown." Indeed, Plaintiff conceded below that the record contains "no firm date of return to work. . . ." II App. at 324 (summary judgment hearing) (Plaintiff's attorney); see also id. at 325 (Plaintiff's attorney) ("[T]here is nothing in this record at this time that establishes she would be back at work at a certain date in 1996."). In these circumstances the letters from Plaintiff's doctors do not establish that Plaintiff's leave request was a "reasonable" accommodation.

Plaintiff, however, cites her own affidavit here in which she states that she expected to recover by January 1996. See II App. at 203 ("I believe I would have returned to work in January 1996 if the Department employees had not begun to harass me."). As the district court correctly held, Plaintiff's own belief is not sufficient to create a triable issue of fact,

especially where, as here, her belief is inconsistent with the evidence from her own doctors. See II App. at 341-42 (district judge's oral ruling) ("The only evidence in the record that I can find with respect to this issue, is her affidavit, Exhibit 20, in which she states that she believes she could have returned to work in January of 1996, if Department employees had not harassed her. There is no other evidence. That is not the evidence necessary to establish that she was capable of performing the essential functions of her position. She has not established if or when she could return to work."); see also Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1418 (10th Cir. 1993) ("Martin is unable to provide anything but her own unsupported assertion that the reasons given for her termination are a pretext for sexual discrimination. Conclusory statements are insufficient to defeat a motion for summary judgment."); McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1130 (10th Cir. 1998) (holding that the plaintiff's own opinion was insufficient to establish a triable issue of fact).

Plaintiff next argues that her request was "reasonable" because it complied with Defendants' leave polices. She argues that the court announced such a rule in Rascon. See Appellant's Brief In Chief at 17-18. We are not persuaded. As noted above, in Rascon this court held that a leave request is not reasonable if the "plaintiff failed to present evidence of the expected duration of her impairment." In Rascon, 143 F.3d at 1334, the plaintiff provided such evidence: the plaintiff's doctor told the defendants that a four month in-patient program was likely to effectively treat the plaintiff. See id. The court thus held that

the plaintiff had established that the leave request was a "reasonable" accommodation.  See id.

The ADA, however, does not require an employer to provide all reasonable accommodations.  Instead, an employer need not provide an accommodation that requires "undue hardship."  See 42 U.S.C. § 12112(b)(5)(A) ("[T]he term discriminate includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.").  In Rascon, 143 F.3d at 1334, the defendants claimed that providing the plaintiff with his requested leave would result in such a hardship.  The court held that the plaintiff's leave request could not constitute undue hardship because it was less onerous than the leave offered by the employer's leave policies.  See id. at 1334-35.

Contrary to Plaintiff's reading of Rascon, that case does not establish that a requested leave is a "reasonable" accommodation if such leave is authorized by the employer's leave policies.  Instead, Rascon holds that if leave requested is otherwise "reasonable" – because it provides an expected duration of the impairment – then the leave cannot constitute undue hardship if the requested leave is authorized by the employer's leave policies.  Here Plaintiff never established that her request for leave was "reasonable." Therefore, pursuant to Rascon the court need not address whether her request would

constitute undue hardship. In the circumstances, the nature of Defendants' leave policies is simply not relevant.

In sum, Plaintiff has failed to establish that she was a "qualified individual with a disability" because she failed to show that her requested leave was a "reasonable" accommodation. Therefore, she cannot prevail on her claim under the ADA regardless of whether Defendants caused her condition or subjected her to disability discrimination. In these circumstances the district court correctly granted Defendants' motion for summary judgment on Plaintiff's ADA claim.

## IV

Plaintiff further asserts a retaliation claim. She argues that Defendants subjected her to adverse employment actions because she had filed charges of discrimination with the EEOC.[14] Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter. . . ." 42 U.S.C. §

---

[14] In her opening brief, Plaintiff asserts that Defendants retaliated against her for taking FMLA leave. See Appellant's Brief In Chief at 25. FMLA does prohibit such retaliation. See 29 U.S.C. § 2615(a)(1) (making it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the Act). However, Plaintiff neither alleged a violation of the FMLA in her complaint, nor did she otherwise raise such a claim below. In the circumstances, we will not consider Plaintiff's FMLA retaliation argument. See Rademacher v. Colorado Ass'n of Soil Conservation Dists. Med. Benefit Plan, 11 F.3d 1567, 1572 (10th Cir. 1993) ("The general rule, however, is that the failure to raise the issue with the trial court precludes review except for the most manifest error.") (citation, alteration, and internal quotation marks omitted).

2000e-3(a). Title VII, therefore, prohibits an employer from retaliating against an employee who has filed a charge of discrimination with the EEOC, see McGarry, 175 F.3d at 1201, but only when the charge alleges discrimination on the basis of "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a). Plaintiff's charges alleged age and disability discrimination. Accordingly, Plaintiff cannot state a claim of retaliation under Title VII.

> Like Title VII, the ADEA makes it
>
> unlawful for an employer to discriminate against any of his employees or applicants for employment, for an employment agency to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because such individual, member or applicant for membership has opposed any practice made unlawful by this section. . . .

29 U.S.C. § 623(d). Therefore, the ADEA prohibits an employer from retaliating against an employee who has filed a charge of age discrimination with the EEOC. As indicated above, however, the ADEA does not validly abrogate the states' Eleventh Amendment immunity. See Kimel, 120 S. Ct. at 650. Accordingly, Plaintiff cannot pursue a claim of retaliation against Defendants, a state agency, under the ADEA.

Finally, the ADA, like Title VII and the ADEA, also provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203. Therefore, the ADA prohibits an employer from retaliating against an employee who has filed a charge of disability

discrimination with the EEOC. As stated above, the ADA (unlike the ADEA) validly abrogates the states' Eleventh Amendment immunity. Accordingly, we consider whether Plaintiff adequately states a claim for retaliation under the ADA.

Retaliation claims generally proceed under the McDonnell Douglas burden-shifting analysis. Gonzagowski v. Widnall, 115 F.3d 744, 749 (10th Cir. 1997).[15] Under that analysis, the employee must first establish a prima facie case of retaliation by demonstrating that: "(1) she engaged in protected opposition to [ADA] discrimination or participated in a[n] [ADA] proceeding; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) there is a causal connection between the protected activity and the adverse employment action." Penry v. Federal Home Loan Bank of Topeka, 155 F.3d 1257, 1263-64 (10th Cir. 1998) (quoting Cole v. Ruidoso Mun. Schs., 43 F.3d 1373, 1381 (10th Cir. 1994)); see also Morgan v. Hilti, Inc., 108 F.3d 1319, 1324 (10th Cir. 1997) (stating the same requirement).

If the employee establishes a prima facie case, the burden then shifts to the employer

---

[15] A plaintiff "may also establish discrimination directly, in which case the McDonnell Douglas framework is inapplicable." Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir.), cert denied, 120 S. Ct. 48 (1999). "To prevail via this direct method, a plaintiff must introduce direct or circumstantial evidence that the alleged retaliatory motive actually relates to the question of discrimination in the particular employment decision, not to the mere existence of other, potentially unrelated, forms of discrimination in the workplace." Id.; see also Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1207 (10th Cir. 1999) ("[S]tatements of personal bias or prejudice[] do not constitute direct evidence of discrimination."). Plaintiff has not argued (and cannot successfully argue) that she satisfies that requirement.

to articulate legitimate, non-retaliatory reasons for the adverse action.  See Medlock v.

Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir.), cert denied, 120 S. Ct. 48 (1999).  If the

employer meets its burden, the burden shifts back to the employee to demonstrate that the

proffered reasons are pretextual.  See id.  The employee can prove pretext by "showing

either that a discriminatory reason more likely motivated the employer or that the

employer's proffered explanation is unworthy of credence."  Shorter v. ICG Holdings, Inc.,

188 F.3d 1204, 1208 (10th Cir. 1999) (citation, alteration, and internal quotation marks

omitted); see also Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)

(stating the same requirement).

Plaintiff alleges that Defendant took several separate employment actions in

retaliation for her filing charges with the EEOC.  We examine each claim in turn.

**A**

Plaintiff first alleges that Defendants refused to provide her with the donated leave

application because she had filed a charge with the EEOC.  See Appellant's Brief In Chief

at 24-26.  To establish a prima facie case of retaliation, however, Plaintiff must prove,

among other requirements, that "she suffered an adverse employment action

contemporaneous with or subsequent to" the filing of her charge with the EEOC.  Penry,

155 F.3d at 1263-64.  Plaintiff concedes that Defendants refused to provide her with the

annual donated leave forms in early August.  See II App. at 199 (Plaintiff's affidavit) ("In

early August 1995, I went to the Human Resources Office of the Department.  I requested

from Carla Armijo the appropriate forms to complete to request Annual Donated Leave pursuant to the Department's Catastrophic Leave Policy. . . . Ms. Armijo told me that since I had an attorney representing me on my grievance against the Department, she could not give me any forms and refused to do so.").

Plaintiff did not file her first charge with the EEOC until September 29, 1995, over a month after the challenged employment action in early August. That being so, Plaintiff cannot prove that the employment action occurred "contemporaneous with or subsequent to" her filing a charge with the EEOC. Therefore, Plaintiff's first claim of retaliation fails.

**B**

Plaintiff further argues, however, that Defendants' refusal to consider her request to participate in the donated annual leave program constitutes unlawful retaliation. We are persuaded that plaintiff established a prima facie case of retaliation: (1) Plaintiff filed a charge of discrimination with the EEOC, which constituted protected opposition to ADA discrimination; (2) Defendants denied plaintiff's request to participate in the annual donated leave program on November 6, 1995, a date subsequent to her filing of her first EEOC charge on September 29, 1995; and (3) the temporal proximity between the protected filing of the EEOC charge and the adverse employment action of refusing Plaintiff's request is sufficient to demonstrate a causal connection. See McGarry, 175 F.3d at 1201.

The burden then shifted to Defendants to offer a legitimate, non-retaliatory rationale for those decisions. Defendants met that burden by stating that it refused to consider Plaintiff's request because she was AWOL. See II App. at 189. The burden thus shifted back to Plaintiff to prove that this proffered rationale was pretextual.

To demonstrate such pretext, Plaintiff points to the combination of circumstances of the manner and timing of Defendants' refusal to consider her application to participate in the annual leave donation program, and Defendants' designating her AWOL retroactively to October 18, 1995. See Appellant's Brief In Chief at 24-25. We agree that such circumstances are sufficient for the trier of fact to find pretext.

Plaintiff requested that Defendants allow her to participate in the annual donated leave program on October 16, 1995. See II App. at 182-83. At that time, Plaintiff was not AWOL; she had been placed on leave without pay by her supervisor, pending completion of a request for extended leave without pay (which Plaintiff also submitted on October 16, 1995). See id. at 170. Defendants received Plaintiff's requests for extended leave without pay and for participation in the annual donated leave program on October 18, 1995. See id. at 182, 183, 187. On November 6, Defendants denied Plaintiff's request for extended leave without pay because Plaintiff refused to waive her right to return to an equivalent position. See id. at 187-88. In that same November 6, 1995 letter, Defendants also placed Plaintiff on AWOL status, retroactively to October 18, 1995, the date on which defendant received Plaintiff's requests. Defendants then refused to consider Plaintiff's request to participate in

the annual donated leave program because she was AWOL. See id. at 189.

A rational trier of fact could infer pretext from the timing and manner of Defendants' action. Specifically, Plaintiff was not AWOL when she submitted her request to participate in the annual donated leave program and Defendants refused to consider her request because it retroactively deemed her AWOL. Although Defendants may have retroactively declared Plaintiff AWOL for a legitimate reason, a rational trier of fact could also infer that Defendants took the action for an illegitimate reason. In the circumstances, the district court erred by granting Defendants' motion for summary judgment. See Christie v. Iopa, 176 F.3d 1231, 1240 (9th Cir. 1999) ("Although Kimura's actions may have an innocent explanation, on summary judgment the only question is whether a rational juror could infer a noninnocent explanation. A rational juror could infer that Kimura's acts showed affirmative agreement with Iopa's actions. In the circumstances, the district court erred by granting summary judgment to Defendants on Anderson's claim. . . ."), cert. denied, 120 S. Ct. 324 (1999); see also Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996) ("Granting plaintiff the benefit of every favorable inference, the pattern of actions taken by defendants precludes summary judgment concerning defendants' motivation in demoting plaintiff and terminating his employment."); Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1504 (10th Cir. 1996) ("This case presented material factual disputes which should have been resolved by the trier of fact. If the jury had found CUNA's reasons to be pretexts for age discrimination then it could have inferred intentional

discrimination and found in favor of Ms. Corneveaux.").

In sum, we hold that the summary judgment rejecting the retaliation claim was error for reasons stated above in this Part IV-B of this opinion. With respect to this claim of retaliation based on the manner and timing of Defendants' refusal to consider Plaintiff's application for participation in the annual donated leave program and Defendants' related actions, we reverse the grant of summary judgment.

## V

Plaintiff has challenged the district court's decision to award costs to Defendants. Because we have reversed the district court's decision in part, we remand for reconsideration of the cost question in light of our decision.

## VI

Accordingly we AFFIRM in part and REVERSE in part the district court's grant of summary judgment for Defendants. We REMAND for further proceedings consistent with this opinion.

APPENDIX

In full, 42 U.S.C. § 12101 states:

The Congress finds that--

(1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;

(3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally;

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of

purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals;  and

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.

(b) Purpose

It is the purpose of this chapter--

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

No. 98-2215, *Rebecca Cisneros v. Heather Wilson et al.*

**KELLY**, Circuit Judge, concurring in part and dissenting in part.


I.

At oral argument, Defendants raised the Eleventh Amendment, which had not been presented to the district court or in their appellate briefs. The Eleventh Amendment may be raised at any stage of the proceedings, and sua sponte. See Calderon v. Ashmus, 523 U.S. 740, 745 n.2 (1998); Higgins v. Mississippi, 217 F.3d 951, 953-54 (7th Cir. 2000); United States ex rel. Long v. SCS Business & Technical Institute, Inc., 173 F.3d 890, 893 (D.C. Cir. 1999). Our cases have considered Eleventh Amendment immunity sua sponte, and in similar circumstances. See, e.g., Sutton v. Utah State Sch. for the Deaf and Blind, 173 F.3d 1226, 1231-32 (10th Cir. 1999); V-1 Oil Co. v. Utah State Dep't of Pub. Safety, 131 F.3d 1415, 1419-20 (10th Cir. 1997); Mascheroni v. Board of Regents of the Univ. of Cal., 28 F.3d 1554, 1559 (10th Cir. 1994).

In view of the Supreme Court's holding in Wisconsin Dep't of Corrections v. Schacht, 524 U.S. 381 (1998), however, it seems appropriate to consider whether the Defendants have waived their Eleventh Amendment immunity argument.

According to the Court,

> The Eleventh Amendment . . . does not automatically destroy original jurisdiction. Rather, the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The

> State can waive the defense. Nor need a court raise the defect on its own. Unless the State raises the matter, a court can ignore it.

Schacht, 524 U.S. at 389. To be sure, past Supreme Court cases have implied that Eleventh Amendment immunity is in the nature of a subject matter jurisdiction defense. See id., 524 U.S. at 393 (Kennedy, J., concurring). While the Eleventh Amendment may be a limitation on a federal court's judicial power, "it is not coextensive with the limitations on judicial power in Article III." Calderon, 523 U.S. at 745 n.2. Were the Eleventh Amendment truly jurisdictional, a court would not be free to ignore it. See Parella v. Retirement Bd. of the R.I. Employees Retirement Sys., 173 F.3d 46, 55-56 (1st Cir. 1999). Even the Supreme Court has addressed merits questions before Eleventh Amendment immunity. See Vermont Agency of Natural Resources v. United States ex rel. Stephens, 120 S. Ct. 1858, 1865-66 (2000).

Here, Defendants were represented by the able Legal Bureau of the New Mexico State Risk Management Division, and did not raise Eleventh Amendment immunity as an affirmative defense in their answer. They moved to dismiss only the individual Defendants named in their individual capacities. In replying to Plaintiff's argument against the motion, Defendants relied upon abrogation of Eleventh Amendment immunity and stated:

> The waiver of the state's immunity has been validated, at least for Title VII and whether the waiver is valid for the ADA has not been conclusively determined in light of    Seminole Tribe of Fla. v. Florida    , [517 U.S. 44] (1996), but that issue is not asserted in the pending motion.

-2-

Aplt. App. 26. The district court agreed that Eleventh Amendment immunity had been abrogated pursuant to section 5 of the Fourteenth Amendment. Id. at 29. After failing to make an argument that the ADA's abrogation of Eleventh Amendment immunity was invalid, Defendants participated in discovery and then moved for summary judgment on the merits.

Although a state's waiver of Eleventh Amendment immunity must be clear and unequivocal, waiver is possible where the state voluntarily invokes federal jurisdiction or clearly declares its intent to submit to federal jurisdiction. See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 119 S. Ct. 2219, 2226 (1999). We have found waiver where a state removes a case to federal court, asserts immunity and then defends on the merits. See McLaughlin v. Board of Trustees of State Colleges of Colo., 215 F.3d 1168, 1170-71 (10th Cir. 2000) (adopting Justice Kennedy's approach in his concurring opinion in Schacht); see also Sutton, 173 F.3d at 1234-36 (state removed to federal court and litigated on the merits). Of course, merely defending a suit in federal court does not amount to a waiver. But where a state is aware of the Eleventh Amendment argument but withholds it in favor of defending on the merits, its conduct may amount to a waiver. See Neinast v. Texas, 217 F.3d 275 (5th Cir. 2000) ("[T]he state cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense"); Hill v. Blind Indus. & Servs. of Maryland, 179 F.3d 754, 762-63 (9th Cir. 1999). In deciding

-3-

this issue, we may look to the conduct of the state claiming Eleventh Amendment immunity. See Innes v. Kansas State Univ. (In re Innes), 184 F.3d 1275, 1280 (10th Cir. 1999), cert. denied, 120 S. Ct. 1530 (2000). Defendants never presented their current argument to the district court, preferring to hedge the bet at the court of appeals during oral argument. Because the case is easily resolved on grounds narrower than the Eleventh Amendment, I would not reach the Eleventh Amendment issue. See Parella, 173 F.3d at 56-57; see generally Three Affiliated Tribes v. Wold Eng'g, P.C., 467 U.S. 138, 157 (1984); Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).

## II.

I concur in the court's opinion on the merits (parts III & IV), with the exception of part IV(B), which reverses summary judgment on the ADA retaliation claim. While it is true that Plaintiff was on leave without pay status at the time she made her request to participate in the leave donation program, that leave without pay status was **only until** Defendants received a completed request for extended leave without pay. Aplt. App. 170 (Defendants' letter to Plaintiff dated 9/29/95) ("On Friday, September 15, Christine B. Romero, Director of the Human Resources Division, verbally approved leave without pay (as opposed to 'extended leave without pay') until such time as the Department receives your completed Request for Extended Leave Without Pay form

-4-

so we can make a formal decision based on applicable rules."). Plaintiff's request was received on October 18, 1995. Aplt. App. 187. On November 6, 1995, the Defendant denied the request for extended leave without pay because Plaintiff would not waive the "like status and pay, at the same geographic location" condition.    Id. at 188. Plaintiff was placed in AWOL status as of October 18, 1995, which was the date that the leave without pay status ran out.    See id.  She was also given additional time to waive the condition.    See id.

Though the Court states that placement in AWOL status was retroactive, Prop. Op. at 46, it must be remembered that Plaintiff's status after October 18, 1995, was a fait accompli if she would not waive the condition.  None of the summary judgment material suggests that Defendants were under any obligation to grant her extended leave without pay when she would not waive the condition, and then allow her to participate in the leave program.

In seeking summary judgment, Defendants articulated a legitimate, non-discriminatory reason for placing the Plaintiff in AWOL status as of October 18, 1995–specifically, Plaintiff refused to waive the pertinent condition.    See Aplt. App. 41; Aplee. Supp. App. 32-33.  Defendant then refused to consider the leave donation request as Plaintiff was AWOL and not in good standing.    See Aplt. App.  115, 271. Plaintiff was warned repeatedly about this and the evidence indicates that a failure to report for work when FMLA leave expired might be considered a voluntary

-5-

resignation.   <u>See</u> Aplee. Supp. App. 26.

In my view, Plaintiff completely failed to demonstrate pretext.        <u>See</u> <u>Anderson</u> <u>v. Coors Brewing Co.</u>, 181 F.3d 1171, 1180 (10th Cir. 1999) (discussing pretext).  For example, Plaintiff's response to the summary judgment motion states:

> 25.  Other employees of the Defendant have been granted donated annual leave despite the sworn affidavit of Christine Romero, which contradicts her deposition testimony. [16] Her affidavit indicates no other coworkers of Plaintiff had been granted said leave.

> 26.  Defendant Christine Romero has indicated an animosity towards the Plaintiff over a number of years.

Aplt. App. 144 (citations omitted).  Plaintiff then points to a coworker (Don Lawson) who requested donated annual leave because of a medical condition that required a six-month absence.   <u>Id.</u> at 174, 202.  Plaintiff, however, has no evidence that the coworker was similarly situated to her–that the coworker was at a point where he needed indefinite extended leave without pay and refused to waive the pertinent condition simultaneously with requesting leave donations.        <u>Cf.</u> <u>Krouse v. American Sterilizer</u> <u>Co.</u>, 126 F.3d 494, 504 (3rd Cir. 1997) (analyzing "similarly situated" in ADA retaliation context).  Nothing indicates that the Defendant's reasons are unworthy of belief, thus, I respectfully dissent from part IV(B).

---

[16]The contradiction is hardly apparent.  In opposing summary judgment, Plaintiff has the burden to explain.  <u>See</u> <u>Adler v. Wal-Mart Stores, Inc.</u>, 144 F.3d 664, 671-72 (10th Cir.1998)